**PFIZER INC., Plaintiff,**

v.

**ELAN PHARMACEUTICAL RESEARCH CORP. and Elan Corporation, PLC, Defendants.**

**Civ. A. No. 92–402 LON.**

United States District Court, D. Delaware.

Feb. 4, 1993.

William J. Wade, of Richards, Layton & Finger, Wilmington, DE, Joseph A. Tate (argued), Stephen D. Brown, Judy L. Leone, and Christine C. Levine, of Dechert Price & Rhoads, Philadelphia, PA, William W. Vodra, Robert N. Weiner, and Donald O. Beers, of Arnold & Porter, Washington, DC, for plaintiff.

Jack B. Blumenfeld (argued) and Julia Heaney, of Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Morgan Chu, Kenneth A. Liebman, Gary N. Frischling (argued) and Jeremy J.F. Gray, of Irell & Manella, Los Angeles, CA, for defendant Elan Pharmaceutical Research Corp.

## OPINION

LONGOBARDI, Chief Judge.

### I. NATURE AND STAGE OF THE PROCEEDINGS

This is an action for patent infringement. Presently before the Court is the question of whether the Plaintiff, Pfizer Inc. ("Pfizer"), has standing to bring an infringement action against Defendants Elan Pharma-

ceutical Research Corporation ("EPRC") and its parent, Elan Corporation, PLC ("Elan").

## A. BACKGROUND

On July 9, 1992, Pfizer filed an action for patent infringement against the Defendants. Docket Item ("D.I.") 1. The complaint contains two infringement counts. In Count I, Pfizer alleges that EPRC has infringed and is infringing United States Letters Patent No. 4,412,986 ("the '986 patent") by filing a New Drug Application ("NDA") under § 505(b)(2) of the Federal Food, Drug, and Cosmetic Act. *Id.* at ¶ 29. Pfizer alleges in Count II that EPRC and Elan conducted clinical studies which are not protected activity under 35 U.S.C. § 271(e)(1), thereby infringing the '986 patent. *Id.* at ¶ 33. Pfizer seeks injunctive relief, damages, attorney's fees and costs.

Defendant EPRC filed a motion to dismiss the complaint, D.I. 13, pursuant to Rules 12(b)(6), 12(b)(7) and 19 of the Federal Rules of Civil Procedure on the ground that Pfizer lacks standing to assert a claim for infringement of the '986 patent and that Bayer AG ("Bayer"), the owner of the '986 patent, is not a party.[1]

Subsequent to briefing, but prior to the Court's rendering a decision on Defendant

EPRC's motion to dismiss, Pfizer filed motions for a temporary restraining order and expedited relief pursuant to Fed.R.Civ.P. 65. Pfizer sought a temporary restraining order staying the FDA's effective approval date of EPRC's NDA pending a hearing on Pfizer's motion for expedited relief, D.I. 90, and also relief pursuant to 35 U.S.C. § 271(e)(4)(A) staying the effective approval date of EPRC's NDA pending a full trial on the merits of this action, D.I. 89.[2]

Pfizer and EPRC briefed the motion for expedited relief,[3] D.I. 92–93 and 113–118, and on December 23, 1992, the Court heard oral argument. To the extent that arguments on EPRC's motion to dismiss for lack of standing were incorporated by the parties into arguments related to Pfizer's motion for expedited relief, the Court considered both motions to be before the Court at oral argument.[4]

## B. TREATMENT OF STANDING ISSUE

Although the ultimate issue before the Court is somewhat narrow, the parties have made it procedurally complex. By a motion to dismiss, Defendant EPRC challenges Pfizer's showing of standing in its complaint. Further, EPRC argues that Pfizer is not entitled to expedited relief in part because it lacks standing. EPRC's

---

1. EPRC also moved to dismiss on second and third grounds, as follows: (1) that Count I fails to state a claim for relief because Pfizer does not have a drug covered by the patent alleged to be infringed by the submission of EPRC's Food and Drug Administration ("FDA") NDA and (2) that Count II fails to state a claim for relief because Pfizer has not alleged any acts of infringement by EPRC. *See* EPRC's Opening Brief in Support of Motion to Dismiss, D.I. 14.

Defendant Elan also filed a motion to dismiss the complaint, D.I. 21, pursuant to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction over Elan, and pursuant to Fed.R.Civ.P. 12(b)(6), 12(b)(7) and 19(b) on all three grounds set forth by Defendant EPRC. Elan's motion to dismiss has been briefed, D.I. 36–37, 43 and 49, and is awaiting resolution.

The Court's decision in the instant opinion, however, renders the resolution of the second and third grounds of EPRC's motion to dismiss, described above, unnecessary. Likewise, the Court's holding renders resolution of Defendant Elan's motion to dismiss on these grounds and on the ground of lack of personal jurisdiction unnecessary.

2. During a telephone conference with Pfizer and EPRC on November 23, 1992, the Court consolidated the motion for a temporary restraining order with the motion for expedited relief and ruled that the Court would treat the remaining *motion for expedited relief, D.I. 89, as a motion for a preliminary injunction. See* Order, D.I. 107.

3. Pfizer's motion for expedited relief deals solely with allegations contained in Count I of the complaint. Because Count I states a claim against Defendant EPRC only, Defendant Elan was not required to respond to Pfizer's motion for expedited relief.

4. At the start of the hearing, the Court stated that the parties were before the Court on "cross-motions." Transcript, D.I. 119 at 2. Moreover, both parties directly addressed EPRC's first and second grounds for dismissing the complaint, *i.e.,* that Pfizer lacks standing and that Pfizer does not have a drug covered by the patent alleged *to be infringed by the submission of* EPRC's NDA.

argument is that to obtain such preliminary relief, a party must show, *inter alia,* that it has a reasonable likelihood of success on the merits of the action at trial. *See, e.g., New England Braiding Co. v. A.W. Chesterton Co.,* 970 F.2d 878, 882 (Fed.Cir. 1992); *E.I. duPont de Nemours & Co. v. Polaroid Graphics Imaging, Inc.,* 706 F.Supp. 1135, 1140 (D.Del.), *aff'd without opinion,* 887 F.2d 1095 (Fed.Cir.1989). Manifestly, if Pfizer lacks standing to sue for patent infringement, it cannot establish a reasonable likelihood of success on the merits.

 Federal courts are under an independent obligation to examine their own jurisdiction, and standing "is perhaps the most important of [the jurisdictional] doctrines." *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990) (quoting *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)). Standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *United States v. AVX Corp.,* 962 F.2d 108, 113 (1st Cir.1992) (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)).

 It is well settled that standing cannot be "inferred argumentatively from averments in the pleadings," *Grace v. American Cent. Ins. Co.,* 109 U.S. 278, 284, 3 S.Ct. 207, 210, 27 L.Ed. 932 (1883), but rather "must affirmatively appear in the record," *Mansfield, C. & L.M.R. Co. v. Swan,* 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884). *FW/PBS,* 493 U.S. at 231, 110 S.Ct. at 608. Additionally, the party who seeks the exercise of jurisdiction in his favor has the burden of clearly alleging facts demonstrating that he is a proper

party to invoke judicial resolution of the dispute. *Id.* (citing *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Warth,* 422 U.S. at 518, 95 S.Ct. at 2215).

 Thus, the task facing the Court is to determine whether Pfizer's standing to sue for infringement of the '986 patent "affirmatively appears in the record." *See FW/PBS,* 493 U.S. at 231, 110 S.Ct. at 608. Standing to sue for infringement generally rests with the legal title holder to the patent. *See Arachnid, Inc. v. Merit Indus., Inc.,* 939 F.2d 1574, 1579 (Fed.Cir.1991) (a party who does not hold legal title to a patent during the time of infringement as a general rule is not permitted to recover damages at law for patent infringement).[5] Moreover, a mere licensee does not have standing to sue for patent infringement in its own name. *See Waterman v. Mackenzie,* 138 U.S. 252, 255, 11 S.Ct. 334, 335, 34 L.Ed. 923 (1891).

Pfizer alleges that Bayer was assigned "the entire right, title and interest in and to the invention contained in the … '986 patent," and that Bayer and Pfizer entered into a license agreement (the "Bayer/Pfizer Agreement" or the "Agreement") which "gave Pfizer an exclusive license in the United States to make, use and sell Bayer's patented products or processes related to the compound nifedipine." D.I. 1 at ¶¶ 8–10. Pfizer also alleges that "[a]mong the Bayer patents covered by Pfizer's exclusive license is the 'Nifedipine Containing Solid Preparation Composition,' patented in the '986 patent." *Id.* at ¶ 11. While referring to the Bayer/Pfizer Agreement as granting Pfizer certain rights related to the '986 patent, Pfizer failed to incorporate

---

5. While *Arachnid* was a case in which the plaintiff sought to recover monetary damages for patent infringement, *i.e.,* an action "at law," Pfizer does not argue that the general rules for standing to sue for patent infringement differ in the instant action. Pfizer seeks equitable relief in Count I of the complaint against EPRC and both equitable relief and monetary damages in Count II against EPRC and Elan. Although *Arachnid* recognized that a determination of standing may differ when equitable relief is

sought, the cases cited and distinguished by the court for this proposition involved "equitable title holders" seeking injunctive relief. *See Arachnid,* 939 F.2d at 1578–80 ("a federal district court has jurisdiction to determine a 'claim for infringement,' asserted by an adjudged equitable title holder, as a prerequisite to awarding equitable relief for that infringement"). Pfizer does not claim to be an equitable title holder of the '986 patent.

the Agreement as an exhibit to the complaint.

Pfizer has not alleged that it is the owner of the patent. In fact, Pfizer alleges that Bayer owns the entire right, title and interest in and to the invention contained in the '986 patent. D.I. 1 at ¶ 8. Clearly, Pfizer must allege that its standing to sue for infringement arises from a source other than legal title to the patent. According to the complaint, Pfizer apparently finds that source in the Bayer/Pfizer Agreement.

EPRC initially asserts that the Agreement demonstrates that Pfizer lacks standing to sue for infringement of the '986 patent. Second, EPRC contends that Pfizer is a mere licensee under the terms of the Agreement and thus lacks standing to sue for infringement as a matter of law. Third, EPRC argues that Bayer is a necessary party under Fed.R.Civ.P. 19(a) and an indispensable party under Fed.R.Civ.P. 19(b), requiring the dismissal of the action unless and until Bayer joins as a plaintiff. *See* D.I. 14.

The Court notes that Defendant EPRC moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6).[6] For the present analysis, the Court will consider the standing issue in the context of Rule 12(b)(6). In support of its motion, EPRC filed a declaration from outside counsel which contained attachments including a redacted copy of the Bayer/Pfizer Agreement. *See* Declaration in Support of EPRC's Motion to Dismiss, D.I. 15, Exhibit ("Ex.") A. When matters outside the pleading are presented to and not excluded by the court, the Rule 12(b)(6) motion is normally treated as one for summary judgment under Rule 56. *See* Fed. R.Civ.P. 12(b); *Rose v. Bartle*, 871 F.2d 331, 340 (3d Cir.1989); *JM Mechanical Corp. v. United States*, 716 F.2d 190, 197 (3d Cir.1983). Here, the Court must consider the Bayer/Pfizer Agreement to determine the standing issue.

■ When deciding a Rule 12(b)(6) motion, the Court may consider the terms of an agreement referenced in the complaint. *See Brill v. Burlington Northern, Inc.*, 590 F.Supp. 893, 895 n. 2 (D.Del.1984) (holding that court properly considered "those documents which were referred to in the plaintiff's amended complaint"); *see also* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1327, at 762–63 (1990); *Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. Am.*, 405 F.Supp. 370, 374 n. 1 (M.D.Pa.1975) (in considering an agreement referred to in the complaint on a Rule 12(b)(6) motion, the Court observed that the "better practice would have been for plaintiffs to set forth the entire contract or to attach that document to the complaint in the first place"), *aff'd in relevant part*, 544 F.2d 1207 (3d Cir.1976). *Cf. Warth v. Seldin*, 422 U.S. 490, 501–02, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1975) (explaining that it is within the trial court's power to allow or require a plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed

---

**6.** EPRC moved to dismiss the entire action pursuant to Fed.R.Civ.P. 12(b)(6), 12(b)(7) and 19. Although not articulated, EPRC essentially argues in part that because Pfizer lacks standing, it fails to state a claim for relief. Additionally, because Fed.R.Civ.P. 12(b)(7) and 19 relate to the failure to join an indispensable party, a corollary of the standing issue, the Court concludes that EPRC's motion to dismiss the complaint for lack of standing and as a matter of law is grounded upon Fed.R.Civ.P. 12(b)(6).

Some motions to dismiss, while not falling within the seven enumerated defenses allowed by motion under Rule 12(b), nonetheless are presented to and determined by the federal courts as a matter of course. *See* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1360, at 430–31 (1990). A motion

to dismiss for lack of standing may be treated as a motion to dismiss for failure to state a claim for relief. *Id.* at 436; *see also United States v. AVX Corp.*, 962 F.2d 108, 114 (1st Cir.1992) (in ruling on a motion to dismiss for want of standing, the trial court must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party; in practical effect, the standard is much the same as that traditionally applied to motions to dismiss under Fed.R.Civ.P. 12(b)(6)). The *AVX Corp.* court recognized, as does this Court, that a Rule 12(b)(1) motion to dismiss for want of subject matter jurisdiction arguably provides a closer analogy. *AVX Corp.*, 962 F.2d at 114–15 n. 6. Here, as in *AVX Corp.*, EPRC did not move the Court to apply the jurisprudence of Rule 12(b)(1). *See id.*

supportive of plaintiff's standing; if after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed). Consideration of the terms of a document referenced in the complaint, therefore, does not convert the motion to dismiss for lack of standing into one for summary judgment. Moreover, Pfizer does not question the authenticity and validity of the redacted Bayer/Pfizer Agreement and, in fact, cites the Agreement in its arguments opposing the motion. Accordingly, if the only matters before the Court were the complaint and the Bayer/Pfizer Agreement, the Court would treat EPRC's motion solely as one to dismiss under Fed.R.Civ.P. 12(b)(6).

■ Both parties, however, have placed additional matters outside of the pleadings before the Court.[7] Because the parties relied on matters outside of the complaint, the Court will treat Defendant EPRC's motion to dismiss on the ground of lack of standing as one for summary judgment.[8] *See, e.g., Public Interest Research Group of N.J. v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 70 (3d Cir.1990) (when additional evidence outside the pleadings is submitted on the issue of standing, the district court should treat the motion as one for summary judgment), *cert. denied,* — U.S. ——, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991).

## C. SUMMARY JUDGMENT STANDARD

■ Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact that can be resolved at trial and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Materiality is determined by the substantive law that governs the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this inquiry, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* A dispute is "genuine" only if a reasonable jury could return a verdict for the nonmoving party. *Id.* Following a determination that no genuine dispute of material facts exists, the moving party must demonstrate that it is entitled to judgment as a matter of law.

■ Once the moving party has made and supported its motion, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

■ Any doubts as to the existence of genuine issues of fact will be resolved against the moving party and all inferences to be drawn from the material it submits will be viewed in the light most favorable to the party opposing the motion. *Norfolk Southern Corp. v. Oberly,* 632 F.Supp.

---

**7.** *Pfizer relied in part on documents related to the Bayer/Pfizer Agreement. See id.;* D.I. 92, Appendix, Ex. J–K. In opposing Pfizer's motion for expedited relief, Defendant EPRC likewise placed additional documents related to the Bayer/Pfizer Agreement before the Court in arguing that Pfizer lacks standing. *See* D.I. 113 at 12–16; Appendix, D.I. 114. Further, for the first time in the course of the proceedings, Pfizer included a copy of the Bayer/Pfizer Agreement as an exhibit to its reply brief. *See* D.I. 118, Ex. B. Pfizer additionally submitted the declaration of Paul S. Miller, Senior Vice President and General Counsel of Pfizer, along with various documents related to the Bayer/Pfizer Agree-

ment, in support of its arguments for standing. *See* D.I. 117, Affidavit ("Aff.") 2 and accompanying exhibits. Finally, at oral argument on standing, both parties relied on matters outside of both the complaint and the Agreement.

**8.** The Court additionally placed the parties on notice that, absent objection, it intended to treat EPRC's motion to dismiss as one for summary judgment because the parties relied on matters outside the pleadings. Neither party objected to the Court's suggested treatment, nor did either party ask to supplement the evidence in the record.

1225, 1231 (D.Del.1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)), *aff'd*, 822 F.2d 388 (3d Cir.1987). If the evidentiary record supports a reasonable inference that the ultimate facts may be drawn in favor of the responding party, then the moving party cannot obtain summary judgment. *In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238, 258 (3d Cir.1983), *rev'd on other grounds*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## II. DISCUSSION

### A. PFIZER'S STANDING TO SUE IN ITS OWN NAME FOR INFRINGEMENT OF THE '986 PATENT UNDER THE BAYER/PFIZER AGREEMENT

Defendant EPRC initially argues that Pfizer lacks standing because the Bayer/Pfizer Agreement does not give Pfizer the right to bring the instant action. Paragraph 5.1 of the Agreement is pertinent to the issue. The resolution of whether this provision grants Pfizer the right to sue EPRC and Elan requires interpretation of its terms. Thus, any discussion of the merits must be preceded by a decision of what law to apply to this question of pure contract interpretation.

As discussed at length in subsection II. C., however, the Court conducts this analysis not to determine the rights and obligations of the parties to the Bayer/Pfizer Agreement, but solely to determine if the evidence in the record supports a conclusion that Pfizer has demonstrated standing to sue sufficiently to survive the Defendants' motion for summary judgment. To the extent that the Court would be required to construe Bayer's rights and obligations under the Agreement, the Court chooses not to do so, concluding in subsection II.C. that Bayer is an indispensable party to this action.

### 1. Choice of Law

As a preliminary matter, the Court must decide whether a federal district court, sitting in a federal question jurisdiction patent case,[9] should rely on state contract law or apply some sort of federal common law of contracts to matters of contract interpretation. *See Amgen, Inc. v. Chugai Pharmaceutical Co.*, 808 F.Supp. 894, 901 n. 9 (D.Mass.1992). The *Amgen* court adopted the view found in 6 Lipscomb, *Walker on Patents* § 20:58 at 202 (1987), which states that "[t]he general rules of construction for contracts are applicable to the construction of patent licenses. The construction of patent license agreements is governed by state law." *Amgen*, 808 F.Supp. at 901 n. 9. This Court agrees, and will apply state law to the matter of pure contract interpretation.

Essentially, a patent license agreement in its most basic form is nothing more than a commercial contract between private parties. *See Power Lift, Inc. v. Weatherford Nipple–Up Sys., Inc.*, 871 F.2d 1082, 1085 (Fed.Cir.1989) (explaining that a license agreement is a contract governed by ordinary principles of state contract law). *Cf. Kiwanis Int'l v. Ridgewood Kiwanis Club*, 806 F.2d 468, 472 n. 8 (3d Cir.1986) (explaining that trademark license agreement is a contract to be interpreted under state law). The Third Circuit Court of Appeals instructs that "[t]he construction of contracts is usually a matter of state, not federal, common law." *General Eng'g Corp. v. Martin Marietta Alumina, Inc.*, 783 F.2d 352, 356 (3d Cir.1986).

This case invokes the federal question jurisdiction of the Court. In federal question cases, federal courts are directed to apply a federal common law choice of law rule to determine which jurisdiction's substantive law should apply. *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1179 n. 8 (3d Cir.1992); *Wells Fargo Asia Ltd. v. Citibank, N.A.*, 936 F.2d 723, 726 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2990, 120 L.Ed.2d 868 (1992). *See, e.g., Schoen-*

---

9. Subject matter jurisdiction in the instant case is based upon 28 U.S.C. § 1338, which provides in pertinent part that district courts have original jurisdiction of any civil action arising under any act of Congress relating to patents. 28 U.S.C. § 1338(a).

berg v. Exportadora de Sal, S.A. de C.V., 930 F.2d 777, 782 (9th Cir.1991); *Edelmann v. Chase Manhattan Bank, N.A.,* 861 F.2d 1291, 1294 (1st Cir.1988); *Harris v. Polskie Linie Lotnicze,* 820 F.2d 1000, 1003 (9th Cir.1987); *Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786, 795 (2d Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981). Courts have relied on the Restatement (Second) of Conflict of Laws (the "Restatement") as a source of federal common law choice of law principles. *See, e.g., Chuidian v. Philippine Nat'l Bank,* 976 F.2d 561, 564 (9th Cir. 1992); *Harris,* 820 F.2d at 1003. *See also Schoenberg,* 930 F.2d at 782 (explaining that federal common law follows the approach of the Restatement); *Edelmann,* 861 F.2d at 1295 (relying on Restatement principles in determining federal choice of law).

Pursuant to section 187 of the Restatement, if reasonable, a contractual choice of law provision should be given effect. *See* Restatement (Second) of Conflict of Laws § 187 (1988); *Morgan Guar. Trust Co. v. Republic of Palau,* 693 F.Supp. 1479, 1494 (S.D.N.Y.), *reconsideration granted on other grounds,* 702 F.Supp. 60 (1988). Upon a close examination of the Agreement, the Court noted that it contains a "choice of law" provision, which the parties had failed to cite to the Court. Paragraph 11.1 provides that "[Bayer and Pfizer] ... agree that the validity of this License Agreement and their respective rights and obligations under it shall be governed by the Law of the Federal Republic of Germany." D.I. 118, Ex. B at ¶ 11.1. Presumably, interpretation of the contract is governed by German law.

Notwithstanding an apparent choice of foreign law in the Agreement, neither Pfizer or EPRC gave notice under Fed.R.Civ.P. 44.1 that it intended to raise an issue of foreign law. Federal Rule of Civil Procedure 44.1 provides in part that "[a] party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice." Due to the parties' failure to raise the choice of law issue, the Court brought the choice of law provision and Fed.R.Civ.P. 44.1 to their attention and requested them to present their positions on why it was ignored.

In response, Pfizer submitted the affidavit of a German attorney, Oliver Axster, which purports to set forth, *inter alia,* German law principles of contract interpretation.[10] D.I. 128, Axster Aff. Pfizer belatedly argues that because the Bayer/Pfizer Agreement expressly provides that German law should govern Pfizer's "respective rights and obligations under it," German law should be applied to matters of contract interpretation. While the Court does not disagree that a choice of law provision in a contract carries import in a choice of law determination, Pfizer has failed to provide in its response adequate information on German law principles of contract interpretation.

The Court is free to disregard the Axster Affidavit under Rule 44.1. *See, e.g., Chantier Naval Voisin v. M/Y Daybreak,* 677 F.Supp. 1563, 1567 (S.D.Fla.1988) (court not bound by evidence submitted by party's expert on foreign law). *See also Banque Libanaise Pour Le Commerce v. Khreich,* 915 F.2d 1000, 1006–07 (5th Cir.1990) (party obligated to present to the district court clear proof of relevant foreign law). According to Rule 44.1, the Court "may consider any relevant material or source, including testimony...." The Axster Affidavit, however, lacks any probative exposition of German principles of contract interpretation, and references no authority on German law principles.[11] Under Rule 44.1, a court is not required to engage in its own

10. Pfizer's expert opines at great length as to whether a German court would interpret the Bayer/Pfizer Agreement as granting to Pfizer the right to sue EPRC and Elan in its own name as a matter of law. The question of whether a party has standing to sue in a United States District Court for infringement of a United States patent is a matter of United States law, as discussed more fully *infra* note 23.

11. The sole averments related to general principles of contract interpretation in the affidavit of Pfizer's expert are his unsupported statements that "[u]nder German law, subsequent course of dealing under a particular contractual provision

research and has the right to insist that the proponent of the foreign law present evidence on the question. *See Cunningham v. Quaker Oats Co.,* 107 F.R.D. 66, 77 (W.D.N.Y.1985). According to commentators, "[i]n many instances the [court] will not utilize the prerogatives found in the second sentence of Rule 44.1 [stated above]." 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2444, at 408 (1971). Nothing in Rule 44.1 requires a court to engage in private research; the rule preserves the court's right to insist upon a complete presentation by counsel on the foreign-law issue. *Id.*[12]

Moreover, research by this Court into German law principles of contract interpretation is rendered unnecessary by Pfizer's concession that the same result would obtain by utilizing New York law. According to Pfizer, New York law is the only other conceivably applicable law to the Agreement's interpretation. The Court agrees.

Under the Restatement, the applicable law depends upon (1) which state has the most contacts with the action and (2) which state has the greater public policy interest in having its law applied. *Union of Flight Attendants, Local No. 1 v. Air Micronesia, Inc.,* 684 F.Supp. 1520, 1528 (D.Haw. 1988), *aff'd without opinion,* 902 F.2d 1579 (9th Cir.1990). The following factors should be taken into account: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, (e) the domicil, residence, nationality, place of incorporation and place of business of the parties. Restatement (Second) of Conflict of Laws § 188(2) (1971).

Bayer, the party to the Agreement who is not presently before the Court, is incorporated and headquartered in Germany. *See* D.I. 118, Ex. B. Pfizer is incorporated in Delaware and has its principal place of business in New York. *See id.;* D.I. 1 at ¶ 1. Under the Agreement, any notice required to be given under its terms to Pfizer must be addressed to Pfizer's headquarters in New York. *See* D.I. 118, Ex. B at ¶ 15.1. All correspondence submitted by the parties regarding negotiations concerning Pfizer's right to prosecute infringement actions under the Agreement shows that the negotiations appear to have taken place between Pfizer's headquarters in New York and Bayer's headquarters in Germany. *See* D.I. 92, Ex. J–K; D.I. 118, Ex. C; D.I. 114 at A69–74 and A116–122; D.I. 117, Aff. 2 and accompanying exhibits. No information before the Court suggests that any state other than New York has a greater interest in the interpretation of the Bayer/Pfizer Agreement. Accordingly, the Court will apply principles of contract interpretation under New York law.

### 2. Paragraph 5.1 of the Bayer/Pfizer Agreement

In examining the express language of paragraph 5.1, the Court notes that the

is relevant to construing contracts. The language of the contract need not be ambiguous for course of dealing evidence to be admissible." D.I. 128, Axster Aff. The Court does not disregard these principles in their entirety but simply notes at this point that if they indeed are correct statements of German law, they in no way affect the Court's decision. Further, to the extent that Pfizer's expert opines as to how German courts would rule on matters of interpretation of the Bayer/Pfizer Agreement, the Court disregards his testimony as usurping the function of this Court. The determination of foreign law is a question of law for the Court. *See* Fed.R.Civ.P. 44.1.

**12.** In *Commercial Ins. Co. v. Pacific–Peru Constr. Corp.,* 558 F.2d 948, 952 (9th Cir.1977), the court was guided by Restatement principles, stating that

[where] either no information, *or else insufficient information,* has been obtained about the foreign law, the forum will usually decide the case in accordance with its own local law.... The forum will usually apply its own local law for the reason that in this way it can best do justice to the parties.... When both parties have failed to prove the foreign law, the forum may say that the parties have acquiesced in the application of the local law of the forum.

(quoting Restatement (Second) of Conflicts of Laws § 136 cmt. h (1971)) (emphasis added). *Accord Banque Libanaise Pour Le Commerce v. Khreich,* 915 F.2d 1000, 1006–07 (5th Cir.1990) ("absent sufficient proof to establish with reasonable certainty the substance of the foreign principles of law, the district court should apply the law of the forum"). This Court finds the cited authority persuasive.

proper interpretation of a contract is a question of law for the court. *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 970 F.2d 1138, 1147–48 (2d Cir.1992) (citing *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989) (applying New York law)), *petition for cert. filed*, 61 U.S.L.W. 3481 (U.S. Dec. 22, 1992) (No. 92–1074). "Where the language of a contract is clear, summary judgment is appropriate, and the fact that one party may have a different interpretation of the language does not make it any less plain." *Harris Trust*, 970 F.2d at 1147 (citing *Investors Ins. Co. of America v. Dorinco Reinsurance Co.*, 917 F.2d 100, 104 (2d Cir.1990) (applying New York law)). Moreover, "[e]xtrinsic evidence is unnecessary where it is determined that the contractual language is unambiguous." *Harris Trust*, 970 F.2d at 1148 (holding that district court properly limited itself to the unambiguous contractual language in resolving an issue of contract interpretation) (citing *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 573–74, 498 N.Y.S.2d 344, 346, 489 N.E.2d 231, 234 (1986)). *See also Investors Ins.*, 917 F.2d at 104 (holding that party precluded from introducing evidence of contract's purpose in order to vary the plain meaning of the writing).

In *Hunt Ltd.*, the Second Circuit precisely defined the standards for interpreting contracts under New York law. The court stated

> [c]ontract language is not ambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Breed v. Insurance Co. of N. Am.*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280, 1282 (1978). Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation. The court is not required to find the language ambiguous where the interpretation urged by one party would "strain[ ] the contract language beyond its reasonable and ordinary meaning." *Bethlehem Steel Co. v.*

*Turner Constr. Co.*, 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 93, 141 N.E.2d 590, 593 (1957). If the terms of a contract are unambiguous, the obligations it imposes are to be determined without reference to extrinsic evidence, *see Teitelbaum Holdings, Ltd. v. Gold*, 48 N.Y.2d 51, 56, 421 N.Y.S.2d 556, 559, 396 N.E.2d 1029, 1032 (1979), . . . .

*Hunt Ltd.*, 889 F.2d at 1277 (additional citations omitted). Moreover, in the summary judgment context, the "[m]ere assertion by [a party] that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact." *Bethlehem Steel*, 2 N.Y.2d at 460, 161 N.Y.S.2d at 93, 141 N.E.2d at 593.

Under paragraph 5.1, Bayer and Pfizer addressed those instances in which Pfizer would be given the right to prosecute an action for infringement of the '986 patent in its own name. It provides in relevant part that:

> *In the event that* a third party should sell the PRODUCT or PFIZER's COMBINATION PRODUCT in the USA in competition with PFIZER infringing BAYER's PATENT RIGHTS, PFIZER may call such infringement to BAYER's attention in writing and request that BAYER take action to abate the infringement.

> *If* within six (6) months after receipt of such notice BAYER has not (i) caused such infringement to be terminated or (ii) initiated legal action against the infringer, *then upon request of PFIZER, BAYER will grant to PFIZER the right to prosecute an action against the infringer in PFIZER's own name.* BAYER then will execute and deliver all documents legally necessary for PFIZER to prosecute such infringement in PFIZER's name. (Emphasis added).

*See* D.I. 118, Ex. B at ¶ 5.1 (emphasis added). According to the affidavit of Paul S. Miller, Pfizer's General Counsel, paragraph 5.1 was a product of negotiations between

Bayer and Pfizer. *See* D.I. 117, Aff. B at ¶ 3.

The express language of paragraph 5.1 conditions Pfizer's right to sue for infringement without joining Bayer as a party. The conditional nature of the language is shown unequivocally by the use of the words "in the event that," "if" and "then" prior to the language that "BAYER will grant to PFIZER the right to prosecute an action against the infringer in PFIZER's own name."

▮ According to the express language of the provision, there are several prerequisites before Pfizer can claim the right to prosecute an action against an infringer in its own name. The first condition is that there be a *sale* by a third party (EPRC in the case *sub judice* ) in the United States which infringes the '986 patent. The Court finds that this language is plain and unambiguous. The phrase "in the event that" is commonly defined to mean "if it should happen that." *See, e.g., Webster's New World Dictionary* 471 (3d College ed. 1988). Clearly, Pfizer's notice to Bayer under paragraph 5.1 is conditioned upon the occurrence of an infringing sale. Any other construction renders the phrase "in the event that" mere surplusage. Thus, by its plain and unambiguous language, paragraph 5.1 does not give Pfizer the express right to sue in its own name for pre-sales infringement.

▮ Pfizer does not allege in its complaint that EPRC has sold a drug product in the United States that infringes the '986 patent. Instead, Pfizer asserts in Count 1 that *EPRC's filing of an NDA* with the FDA to secure approval for the marketing of Nifelan, the allegedly infringing drug, itself *constitutes infringement. See* D.I. 1 at ¶ 29 (emphasis added). This claim against EPRC is based on an alleged artificial act of infringement as defined in 35 U.S.C. § 271(e)(2)(A). *See Eli Lilly & Co. v. Medtronic, Inc.,* 496 U.S. 661, 678, 110 S.Ct. 2683, 2692, 110 L.Ed.2d 605 (1990) (section 271(e)(2) creates a highly artificial act of infringement consisting of the sub-

mission of an Abbreviated New Drug Application ("ANDA") or a paper NDA containing a certification that is in error as to whether commercial manufacture, use, or sale of the new drug (none of which has actually occurred) violates the relevant patent). In Count II, Pfizer alleges that *EPRC infringed the '986 patent by using the formulation of the patent in clinical studies* conducted in the United States in connection with the commercialization of Nifelan, an alleged act of infringement which is not protected activity under 35 U.S.C. § 271(e)(1). *See* D.I. 1 at ¶ 31–33 (emphasis added). Indeed, nowhere in Pfizer's submissions to the Court does Pfizer contend that EPRC has sold a drug product in the United States that infringes the '986 patent. It is undisputed, therefore, that the express condition of paragraph 5.1 of an infringing sale has not been met.

In response to the plain and unambiguous language of the contract, Pfizer relies on its own interpretation of paragraph 5.1 as permitting Pfizer to sue in its own name for *any* act of infringement so long as Pfizer gives the required notice.[13] In support of its contention, Pfizer argues that

[a]t the time the Agreement was executed, the filing of a § 505(b)(2) NDA was not recognized as an act of infringement. The Waxman–Hatch Amendments did not even create a right to sue for infringement based on the filing of a § 505(b)(2) NDA until 1984, well after the Agreement was signed. Since the passage of these Amendments, Bayer's and Pfizer's correspondence and conduct relating to other infringement actions based on the filing of abbreviated NDAs clearly indicates that Pfizer has the right to sue for such infringement under the Bayer/Pfizer Agreement.

D.I. 42 at 7 n. 2. Pfizer further argues that EPRC's assertion that Pfizer must wait until EPRC sells an infringing product in the United States before requesting that Bayer abate the infringement or sue misconstrues the Agreement. D.I. 42 at 21. Pfizer contends that EPRC's interpretation removes from the Agreement a remedy

---

**13.** Notice under paragraph 5.1 is discussed at length *infra.*

that both Bayer and Pfizer clearly intended Pfizer to have, *i.e.,* the right to sue for infringement under 35 U.S.C. § 271(e)(2)(A). *Id.*

When a writing is clear on its face, there is no room for a search for the intent of the parties. *Cf. Bethlehem Steel,* 2 N.Y.2d at 459, 161 N.Y.S.2d at 93, 141 N.E.2d at 593 (court is not required to find language ambiguous where interpretation urged by one party strains the contract language beyond its reasonable and ordinary meaning). This Court need not accept Pfizer's interpretation, therefore, when "there is no reasonable basis for a difference in opinion." *Breed,* 46 N.Y.2d at 355, 413 N.Y.S.2d at 355, 385 N.E.2d at 1282.[14]

■ In further support of its interpretation, Pfizer cites the parties' course of dealings to establish that paragraph 5.1 gives Pfizer the right to bring an action for an infringement under 35 U.S.C. § 271(e)(2)(A). D.I. 92 at 14 n. 12. Specifically, Pfizer offers evidence of correspondence exchanged between Bayer and Pfizer through which *Bayer authorized Pfizer in writing* to sue in its own name under paragraph 5.1 for alleged acts of infringements under 35 U.S.C. § 271(e)(2)(A) when third parties filed ANDAs with the FDA. D.I. 92, Ex. J (emphasis added). Extrinsic evidence is generally unnecessary where it has been determined that the contractual language is unambiguous. *See Harris Trust,* 970 F.2d at 1148; *Investors Ins.,* 917 F.2d at 104. According to the affidavit of Pfizer's expert, however, German law permits a court to consider course of dealing evidence even when the language of the contract is not ambiguous. To the ex-

tent that this principle of German contract interpretation may differ from New York law, consideration of Bayer's and Pfizer's subsequent course of dealing does not affect the analysis.

The Court notes that there is a non-waiver provision in the Bayer/Pfizer Agreement which directs that the parties' course of dealing does not operate to nullify any express contract terms. Specifically, paragraph 14.1 provides that "[a] waiver by either party of any term or condition of this License Agreement in any one instance shall not be deemed or construed to be a waiver of such term or condition for any similar instance of the future...." D.I. 118, Ex. B. at ¶ 14.1. Plainly, Bayer's written authorizations to Pfizer to sue for infringement under 35 U.S.C. § 271(e)(2)(A) based on other instances constitute a waiver of the express condition in those instances but those waivers should not be construed as a waiver of the condition for any subsequent instance.[15]

Through other extrinsic evidence presented to the Court, it is clear that paragraph 5.1 as expressly written does not permit Pfizer to sue for pre-sales infringement absent a waiver from Bayer. Pfizer proposed, for instance, that paragraph 5.1 be amended to read in part that *"[i]n the event that a third party should infringe BAYER's PATENT RIGHTS,* PFIZER may call such infringement to BAYER's attention in writing and request that BAYER take action to abate the infringement." *Id.* at A71 (emphasis added). Obviously, the proposed amendment eliminated the condition of an infringing *sale,* and substituted *any* act of infringement. Bayer responded

---

**14.** EPRC points out that Pfizer asserts in its brief that "prior to 1984, [third] parties wishing to market a drug still patented by another could not even begin to do the studies necessary to obtain FDA approval until after the 'pioneer' patent expired because the studies themselves were held to be acts of infringement." D.I. 42 at 23. Accordingly, EPRC argues, "Bayer and Pfizer had every reason under then-existing law to include in paragraph 5.1 such non-selling 'acts of infringement' as manufacture or use, including 'studies necessary to obtain FDA approval.' But they chose not to." D.I. 40 at 6 n. 4. EPRC's argument is persuasive and further supports the Court's conclusion that it should not

rewrite the plain and unambiguous language of paragraph 5.1 negotiated by Bayer and Pfizer.

**15.** To the extent that Pfizer's arguments support a conclusion that the course of dealing of the parties to the Bayer/Pfizer Agreement in some way constituted an amendment to the infringing sale condition, the Court notes that paragraph 10.2 of the Agreement provides that "[n]o amendment of this License Agreement shall be valid or binding upon the PARTIES hereto unless made in writing and duly executed on behalf of each party hereto." D.I. 118, Ex. B at ¶ 10.2.

in part, by proposing different language. *Id.* at A73–74. Bayer proposed that the provision begin *"[i]n the event that a third party should sell or prepare to sell, as the case may be,* the PRODUCT or PFIZER's COMBINATION PRODUCT in the USA in competition with PFIZER infringing BAYER's patent rights...." *Id.* at A73 (emphasis added). Thus, it is obvious that Bayer and Pfizer were well aware of the import and meaning of the express condition of an infringing sale contained in paragraph 5.1. Needless to say, based on the record before the Court, neither proposed amendment became a part of the Agreement. Consequently, Pfizer's course of dealing argument is unavailing.[16]

■ Absent an infringing sale or a waiver of that condition, Pfizer has no authority under the Bayer/Pfizer Agreement to sue EPRC in its own name for infringement of the '986 patent. Further, no genuine issue of material fact exists because it is undisputed that EPRC has not sold a product in the United States which infringes the '986 patent and Pfizer has produced no evidence of an express waiver of this condition by Bayer authorizing Pfizer to institute suit against EPRC in its own name.

■ Were it not otherwise sufficient, the Court also concludes that Pfizer has not established that it has met paragraph 5.1's remaining express conditions precedent to Pfizer's right to sue for infringement in its own name. By its express terms, paragraph 5.1 contains three additional conditions. First, Pfizer must give notice to Bayer by calling the alleged infringement to Bayer's attention in writing and requesting that Bayer take action to abate the infringement. Second, Bayer has six months after receipt of Pfizer's notice to abate the infringement or initiate legal action against the infringer. Third, after the six month period has passed, Pfizer must request that Bayer authorize Pfizer to bring suit in its own name.

■ Specifically, as to the notice condition, paragraph 5.1 provides that upon an infringing sale, "PFIZER may call such infringement to BAYER's attention in writing and request that BAYER take action to abate the infringement." D.I. 118, Ex. B at ¶ 5.1. The notice requirement is plain and unambiguous on its face. This obtains even though the use of the word "may" in this phrase, when viewed in isolation, seems to grant discretion to Pfizer. The notice condition, however, clearly is not discretionary when the provision is read as a whole. Bayer's authorization to Pfizer under paragraph 5.1 to sue in its own name for infringement is predicated upon such notice. Demonstrating the mandatory nature of the notice condition is the next sentence, which begins "[i]f within six (6) months *after receipt of such notice,"* Bayer has not abated the infringement or initiated legal action against the infringer, then upon Pfizer's request, Bayer will grant the authorization. *See* D.I. 118, Ex. B at ¶ 5.1 (emphasis added). Pfizer's requisite notice to Bayer starts the six month clock.

Pfizer does not dispute that it is required to give notice of infringement to Bayer under this provision.[17] Rather, Pfizer argues that it gave the notice as required.

Under the notice provision's express and unambiguous terms, Pfizer must establish that it did two things to fulfill the notice requirement: first, that Pfizer brought the

**16.** To the extent that Pfizer interprets paragraph 5.1 of the Bayer/Pfizer Agreement to permit Pfizer to sue in its own name upon giving the notice required under the provision *absent an infringing sale,* the Court notes that Bayer's interpretation of the Agreement is not a matter before the Court because Bayer is not a party to the instant action. This situation highlights the difficulties presented to the Court in resolving issues of interpretation and performance of the Agreement in the absence of Bayer, a key party to the Agreement. In Bayer's absence, the Court declines to construe the Agreement to

implicate Bayer's rights and obligations thereunder, as discussed more fully in subsection II.C. *infra.*

**17.** Indeed, Pfizer admits that the notice provision is a condition precedent. *See* Pfizer's Answering Brief in Opposition to EPRC's Motion to Dismiss, D.I. 42 at 12 ("[b]efore filing its [c]omplaint, Pfizer fulfilled the conditions precedent under the contract"); *id.* at 15 (Pfizer required to give notice to Bayer of EPRC's infringement and full opportunity to bring suit).

infringement to Bayer's attention and *requested that Bayer take action to abate the infringement,* and second, that the request was *in writing.* Although offering as evidence some communications from Pfizer to Bayer relating to EPRC's alleged infringement, Pfizer has not produced any document which demonstrates that it *requested in writing that Bayer take action to abate the infringement.*[18]

Pfizer argues that its documents clearly show that "Pfizer first notified Bayer of EPRC's acts of infringement as early as 1989. Pfizer requested Bayer to take action, which, despite numerous communications between Pfizer and Bayer on the issue, Bayer did not do." D.I. 42 at 7. Pfizer further asserts that "Bayer was given notice of this suit and was invited to become involved," D.I. 42 at 17, and that "Bayer elected not to become involved," D.I. 42 at 18.

Initially, Pfizer refers the Court to a letter dated September 13, 1989. The letter simply states that Elan recently filed an NDA for nifedipine,[19] and that Pfizer wished to arrange a conference call to discuss the matter. *See* D.I. 117, Aff. 2, Ex. B. Paul S. Miller ("Miller"), Pfizer's General Counsel, indicates in his affidavit that this letter was Pfizer's first contact with Bayer giving "notice of our concerns regarding possible infringement and ask[ing] Bayer] to assist us in obtaining relevant information to determine whether infringement had occurred." D.I. 117, Aff. 2 at ¶¶ 10–11. Manifestly, the letter itself does

not go so far, and cannot be construed as providing *any* notice whatever to Bayer pursuant to paragraph 5.1.

Pfizer's next communication to Bayer on this subject was a letter dated May 18, 1990, which confirmed a meeting with Bayer to "discuss technical issues relating to US patent No. 4,412,986 and its coverage of the Elan sustained release nifedipine formulations." D.I. 117, Aff. 2, Ex. C. Likewise, this communication in no way may be construed as providing the requisite notice.

The third document produced by Pfizer is a letter from Miller to Bayer dated December 13, 1990. Pfizer asserts that this letter establishes "that Pfizer gave Bayer the six month notice required under the Agreement." D.I. 92 at 14 n. 12; D.I. 92, Ex. K. The letter purports to review the "history of our discussions" on the Elan issue, stating, *inter alia,* that

[i]n the fall of 1989, we[, *i.e.,* Pfizer,] learned that Elan had filed an application to FDA for approval of a sustained release formulation of nifedipine. We subsequently learned that Miles had taken a license to market the formulation.

We were concerned that this filing and other activities in which Elan has engaged may constitute infringement of U.S. Patent No. 4,412,986, licensed to Pfizer under agreement with Bayer.…

In a good faith effort to resolve the matter, Pfizer notified Bayer of this infringement at a meeting held in London on November 27, 1989. We also agreed

---

**18.** In support of its standing argument, Pfizer submitted a copy of a draft version of the Bayer/Pfizer Agreement. In the draft version, paragraph 5.1 provides that in the event of an infringing sale, "PFIZER may give notice of such infringement to BAYER requesting that BAYER take action to abate the infringement." D.I. 117, Aff. 2, Ex. A. As stated by Pfizer's inside General Counsel in his affidavit, the "draft of the Bayer–Pfizer Licensing Agreement … contains language *significantly* different from what appears in the final version of the Agreement." D.I. 117, Aff. 2 at ¶ 3 (emphasis in original). The language of the draft version is less precise than that of the executed Agreement. In the executed Agreement, the corresponding provision requires Pfizer to "call [the] infringement to BAYER's attention *in writing and* request that BAYER take action to abate the

infringement." D.I. 118, Ex. B at ¶ 5.1 (emphasis added). The use of the word "and" as a conjunctive in the final version clearly sets apart the requirement that Pfizer must request in its notice that Bayer take action to abate the infringement. Thus, as discussed at length *infra,* the Court is unwilling to consider either of these requirements mere surplusage and considers both of them necessary components of proper notice under paragraph 5.1.

**19.** For purposes of the present analysis, the reader may assume that Elan and EPRC are interchangeable as referenced in Pfizer's communications with Bayer. According to Pfizer, during the time period of the communications, Pfizer was unaware whether Elan or EPRC filed the NDA. *See* D.I. 117, Aff. 2 at ¶ 21.

in response to your request not to send a written notice of infringement. At the meeting, we asked that Bayer waive the 6 month notice period pursuant to Section 5.1 of the Pfizer/Bayer license agreement dated December 31, 1981. In response to Bayer's request made at that meeting, we attempted to set up a meeting to discuss certain technical issues related to the infringement.... [A] meeting was finally held on May 23, 1990.

At the May 23 meeting, we discussed the scope of the claims of [the '986 patent] as they relate to the examples in [Elan's European Patent Application Nos. 232,-155 and 274,176].... *[I]n our opinion, there are very substantial reasons to believe that the Elan formulation is within the scope of the claims of the '986 patent, which is licensed to Pfizer.*

In order to move forward in fair [sic] and expeditious manner, we request responses to [questions related to Elan's NDA filing and product for which Elan sought FDA approval]....

. . . . .

Finally, I would like to comment on the six month period for notice of infringement under the Bayer/Pfizer license agreement. It is my understanding that you have agreed to waive this notice period. In any event, we believe that the period expired since our first notice to you was in November, 1989 and we discussed the basis for our position in May, 1990, both dates being more than six months ago.

D.I. 117, Aff. 2, Ex. D (emphasis added). The letter mainly purports to recount "discussions" between Pfizer and Bayer. Discussions between the parties do not satisfy the requirement that Pfizer give written notice of infringement to Bayer. The Court observes, however, that the letter calls an alleged act of infringement to Bayer's attention in writing. The highlighted portion of the letter does not simply recount discussions, but instead gives written notice that Pfizer then believed that Elan was infringing the '986 patent. Whether

this satisfies the first prong of the notice requirement, *i.e.*, that Pfizer call to Bayer's attention an "infringing sale," is less clear. The Court need not resolve this question because it concludes below that Pfizer has not met the second prong of the notice requirement.

■ Contrary to Pfizer's assertion, the December 13, 1990 letter does *not* satisfy the second prong of the notice requirement, *i.e.*, that Pfizer request that Bayer take action to abate the infringement. Nowhere in the letter does Miller request that Bayer take action to abate Elan's alleged infringement of the '986 patent. Rather, Pfizer asks Bayer to provide responses to questions related to Elan's NDA and the product for which it sought approval from the FDA.

Moreover, references in the letter to purported discussions do not substitute for the express contractual requirement under paragraph 5.1 that Pfizer request *in writing* that Bayer take action to abate the infringement. Indeed, the references in the letter to discussions between Pfizer and Bayer do not state that Pfizer requested Bayer to take action to abate the alleged infringement during the discussions. Instead, Miller states in the letter that "at a meeting held in London on November 27, 1989[, w]e also agreed in response to your request not to send a written notice of infringement." Thus, Pfizer here concedes . that it has not given the written notice required under paragraph 5.1. Miller's later assertion, that "our first notice to you was in November, 1989," directly contradicts this earlier concession and is accorded no weight by the Court because the purported November, 1989 notice was not *in writing.*

Miller likewise does not assert in his affidavit that Pfizer asked Bayer to abate the infringement at the meeting in November, 1989. *See* D.I. 117, Aff. 2 at ¶ 12. Similarly, Miller does not aver in his affidavit that Pfizer made such a request during the meeting in May, 1990. *Id.* at ¶ 13. Indeed, Pfizer undoubtedly did not request at the May, 1990 meeting that Bayer take action to abate the infringement because

according to Miller, "Bayer ... suggested that the Elan formulation was unlikely to infringe [the '986 patent]." *Id.*

Particularly illuminating on the notice issue is Bayer's written response to Pfizer's letter of December 13, 1990, which, significantly, Pfizer did not present to the Court. Referring to notice under paragraph 5.1, Bayer states that

> ... we would like to point out that, at no time, we were under the impression of Pfizer having notified Bayer of infringement of the .986 patent by any activities which Elan may have engaged. It was our understanding that Pfizer indeed had raised certain concern and that it was in the interest of both Pfizer and Bayer to clarify the situation so far.... [W]e rather proposed first to complete the fact finding and to discuss consequences thereof.
>
> Furthermore, we never requested Pfizer not to send a written notice of infringement, and we never understood having been asked by Pfizer to waive the six month notice period pursuant to section 5.1 of the Bayer–Pfizer Nifedipine License Agreement dated Mai 24/25, 1979. During our discussions you referred so far to our waiver of the six month notice period in a number of cases in the so-called ANDA litigation; in those cases, however, patent infringements were rather obvious, third parties' competing sales could easily be predicted and there were time limits for the plaintiffs due to the ANDA regulations. Insofar ANDA

on the one side and Elan on the other were, and still are, different cases.

. . . . .

> In addition, in the [May 23, 1990] meeting we pointed out that the .986 patent pertains to a technical concept that is opposite to a controlled-release system and that, therefore, an "infringement" appeared to be unlikely.

. . . . .

> In a fair and reasonable evaluation of all these circumstances we do believe that Pfizer has no reason to maintain its view of an infringement within the meaning of section 5.1 of the License Agreement, a view that Pfizer had brought to Bayer's attention neither prior to nor in the May 23, 1990 meeting.

D.I. 114 at A116–119 (Letter dated February 7, 1991). Plainly, Bayer's letter informed Pfizer that, as of February, 1991, Bayer held the view that Pfizer had not complied with *any* prong of the notice provision in paragraph 5.1, and that Bayer likewise had not waived the provision related to Elan's alleged infringement.[20]

Subsequent to Bayer's response, Pfizer apparently has never requested in writing that Bayer take action to abate the alleged infringement. Pfizer relies on its December, 1990 letter as establishing the condition precedent of notice under paragraph 5.1 and has not submitted any other writing which expressly requests Bayer to take the specified action.

The Court notes, however, that in a letter from Pfizer to Bayer dated March 14, 1991,

---

**20.** The divergence between the arguments of Pfizer's inside and outside counsel and the views set forth by Bayer in its February 7, 1991 letter only serve to illustrate the difficulties the Court faces in construing the performance of one party to an agreement when the other party is not before the Court. If Bayer and Pfizer indeed have a genuine dispute as to Pfizer's performance of the terms of paragraph 5.1, the Agreement requires arbitration of the dispute if the parties cannot resolve it amicably. *See* D.I. 118, Ex. B at ¶¶ 13.1 and 13.2.

These disputes no doubt are compounded because Bayer's subsidiary, Miles, plans to market Nifelan for Elan under a provision of the Bayer/Pfizer Agreement through which Bayer reserved the right for it or its affiliate (Miles in the case *sub judice*) to obtain a sublicense to

make, have made, use or sell in the United States the product encompassed by the '986 patent. *See* D.I. 118, Ex. B at ¶ 2.1. If Pfizer and Bayer are unable to resolve their disputes amicably, the Agreement mandates that they submit the disputes to arbitration. In the face of such disagreement, Pfizer could have submitted the disputes to arbitration at any point after receiving notice of Elan's purported infringement of the '986 patent by the Nifelan NDA filing, which according to Pfizer, it received in the fall of 1989. *See* D.I. 117, Aff. 2 at ¶ 5. Having decided not to do so, Pfizer instead either seeks to avoid, or petitions this Court to decide, its controversies with Bayer. The Court, however, will not engage in deciding Bayer's rights and obligations in Bayer's absence.

Pfizer asserted that "[a]t this time, we are contacting Miles and Elan directly with respect to the infringement issue. We ask that Bayer demonstrate its intent to cooperate by facilitating a response." D.I. 117, Aff. 2, Ex. E. Pfizer's request to Bayer in this instance relates back to Pfizer's request in its December, 1990 letter that Bayer provide certain information about Elan's NDA, which Bayer later claimed to be unable to provide. Pfizer does not point to this language as showing that Pfizer asked Bayer to take action to abate the infringement, nor does the Court believe it could do so. Rather, Pfizer was requesting Bayer's cooperation in obtaining "the information." In fact, Miller avers in his affidavit that he was again asking Bayer for assistance in obtaining information about the Elan product. D.I. 117, Aff. 2 at ¶ 16. Miller does not assert that he asked Bayer to abate the infringement.

Pfizer's letter of March, 1991 contains no language expressly requesting that Bayer take action to *abate* the infringement.[21] The Court concludes, therefore, that Pfizer has not established as a matter of law that it met all of the requirements of the notice provision under paragraph 5.1. Moreover, in the absence of evidence to the contrary, there exists no genuine dispute of fact.

Because Pfizer has not established that it properly gave notice, the third condition precedent under paragraph 5.1, *i.e.*, that Bayer then has six months after receipt of Pfizer's notice to abate the infringement or initiate legal action against the infringer, has not been met. The express language provides that *"[i]f within six (6) months after receipt of such notice BAYER has*

*not* (i) caused such infringement to be terminated or (ii) initiated legal action against the infringer, *then upon request of PFIZER*, BAYER will grant to PFIZER the right to prosecute an action against the infringer in PFIZER's own name." D.I. 118, Ex. B at ¶ 5.1 (emphasis added).

Finally, after the six month period has passed, Pfizer then must request that Bayer authorize Pfizer to bring suit in its own name. Pfizer does not claim that it made such a request. In fact, Pfizer stated in its March 14, 1991 letter to Bayer that it hesitated to seek authorization to file a complaint for infringement against Elan in its own name. *See* D.I. 117, Aff. 2, Ex. E. Instead, Pfizer's evidence shows that it simply notified Bayer that it had filed suit against Elan on the day the complaint in the instant action was filed. *See* D.I. 117, Aff. 2, Ex. I.

Pfizer likewise has presented no evidence that it received such authorization from Bayer. Instead, Pfizer argues that "Bayer was given notice of this suit and was invited to become involved," D.I. 42 at 17, and that "Bayer elected not to become involved," D.I. 42 at 18. Miller further avers in his affidavit that "Bayer did not object to our filing" suit against EPRC and Elan. D.I. 117, Aff. 2 at ¶ 22. According to paragraph 5.1, not only must Bayer grant authorization to Pfizer for Pfizer to sue for infringement in its own name, Bayer must then "execute and deliver all documents legally necessary for PFIZER to prosecute such infringement in PFIZER's name." *See* D.I. 118, Ex. B at ¶ 5.1. Pfizer has presented no evidence whatever that Bayer has done so. Pfizer must present some-

---

**21.** Pfizer's latest writing relating to the issue of notice is a letter to Bayer dated July 9, 1992. Pfizer stated that "[a]s you are aware, we have had several discussions with you concerning the potential infringement by Elan of [the '986 patent]. In order to protect our interests, we have now had to file suit against Elan for patent infringement." D.I. 117, Aff. 2, Ex. I. This letter is dated the same day that Pfizer filed suit for infringement against Elan and EPRC in this Court. On July 28, 1992, Bayer sent a letter to EPRC's outside counsel, in which Bayer stated that

[w]e confirm, that Pfizer never gave the notice more precisely described in section 5.1 of

the Bayer/Pfizer Agreement. For good orders' sake however we may point out that Pfizer takes the position that in the course of the correspondence between the companies Pfizer has requested Bayer to waive the six months period under Article 5.1 second paragraph of the above mentioned agreement; we do not concur with Pfizer so far.

D.I. 114 at A123–124. Like Bayer, the Court cannot find a writing from Pfizer to Bayer plainly meeting "the notice more precisely described in section 5.1 of the Bayer/Pfizer Agreement."

thing more than conclusory allegations that Bayer gave Pfizer authorization to prosecute an infringement action against EPRC and Elan before the Court is willing to reach such a conclusion.[22]

Accordingly, the Court finds as a matter of law that Pfizer has not shown that it met the conditions precedent under the express language of paragraph 5.1 of the Bayer/Pfizer Agreement which are prerequisites to Pfizer's prosecuting an infringement action against Elan and/or EPRC in its own name. Summary judgment as to Pfizer's standing under paragraph 5.1 of the Bayer/Pfizer Agreement to sue EPRC and Elan in the present action is granted to Defendants EPRC and Elan.

## B. STANDING AS A MATTER OF PATENT LAW

Defendant EPRC argues alternatively that even if the Bayer/Pfizer Agreement did not preclude the bringing of this action, Pfizer lacks standing as a matter of law. EPRC contends that Pfizer may by construed only as a mere "licensee" under the terms of the Bayer/Pfizer Agreement, and as a mere licensee has no standing to sue for infringement of the '986 patent without joining Bayer, the patent owner. Conversely, Pfizer argues that it is an exclusive licensee pursuant to the Bayer/Pfizer

Agreement, and as an exclusive licensee granted substantially all of the rights in the '986 patent, it has standing to sue for infringement in its own name.[23]

■ Standing to sue for infringement generally rests with the legal title holder to the patent. *See Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1579 (Fed.Cir. 1991). Thus, "[t]he owner of a patent or the owner's assignee can commence an action for patent infringement, but a licensee alone cannot." *Calgon Corp. v. Nalco Chem. Co.*, 726 F.Supp. 983, 985 (D.Del. 1989).[24] *See also Maruzen Int'l Co. v. Bridgeport Merchandise, Inc.*, 770 F.Supp. 155, 158 (S.D.N.Y.1991) (under 35 U.S.C. § 281, in order to sue for patent infringement, the plaintiff must be the owner of the patent, *i.e.*, the patentee or assignee of the patent); *Afros, S.p.A. v. Krauss–Maffei Corp.*, 671 F.Supp. 1402, 1444 (D.Del. 1987) (same), *aff'd without opinion*, 848 F.2d 1244 (Fed.Cir.1988). In short, as a matter of patent law, "[s]tatus as an assignee or patentee is a crucial prerequisite to bringing suit on infringement grounds." *Maruzen*, 770 F.Supp. at 158. *Accord* 6A Charles A. Wright et al., *Federal Practice and Procedure* § 1547, at 365 (1990) (patent grantee or assignee always is the real party in interest in an action involving the

---

**22.** Again, this highlights another apparent dispute between Pfizer and Bayer, *i.e.*, whether Bayer has given Pfizer authorization to sue for infringement. Such a dispute is more appropriately resolved through arbitration as mandated by the Agreement.

**23.** Pfizer attempts to direct the Court to apply German law to the legal issue of standing pursuant to the choice of law provision contained in the Bayer/Pfizer Agreement. Pfizer submitted the Axster Affidavit in support of its argument. Such a result, however, is contrary to United States patent law principles. Although the parties' rights and obligations under the Agreement may be governed by German law, the question of standing to sue for patent infringement is a matter of United States law. *See, e.g., Afros, S.p.A. v. Krauss–Maffei Corp.*, 671 F.Supp. 1402, 1442–46 (D.Del.1987) (while contract interpretation was governed by German law, question of standing was a matter of United States law), *aff'd without opinion*, 848 F.2d 1244 (Fed.Cir. 1988); *Calgon Corp. v. Nalco Chem. Co.*, 726 F.Supp. 983 (D.Del.1989). Consequently, the Court disregards in its entirety those portions of

the Axster Affidavit which purport to argue that the terms of the Bayer/Pfizer Agreement would be sufficient to give Pfizer standing to sue in Pfizer's name in a German court. This case involves a suit on a United States patent in a United States court under a United States statute, 35 U.S.C. § 281. The issue is whether United States law permits Pfizer to sue without joining Bayer as a party, regardless of what German law might allow.

**24.** According to the *Calgon* court,

[l]icensees may be multiple and the extent and nature of their interests in the patented article may be of great variety and of different extents. Multiple litigation by licensees might permit differing decisions on the validity or infringement of a patent. For this reason, the patent holder or assignee is a necessary party to an infringement action in order to achieve consistency of interpretation and to avoid multiplicity of litigation. Under federal law, the patentee is the real party in interest in such litigation.

*Calgon*, 726 F.Supp. at 985 (citations omitted).

patent) (citing *Waterman v. Mackenzie,* 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923 (1891)).

In the recent case of *Ciba–Geigy Corp. v. Alza Corp.,* 804 F.Supp. 614 (D.N.J.1992), the district court described the applicable legal standard for determining whether a transfer is an assignment or a license. The court explained that

[i]n the seminal case of *Waterman v. Mackenzie,* 138 U.S. 252 [11 S.Ct. 334, 34 L.Ed. 923] (1891), the Supreme Court delineated the different types of interests in a patent that a licensor could convey to a licensee. The Supreme Court stated "[t]he patentee or [its] assigns may, by instrument in writing, assign, grant, and convey, either, 1st, the whole patent, comprising the exclusive right to make, use, and vend the invention throughout the United States; or, 2d, an undivided part or share of that exclusive right; or, 3d, the exclusive right under the patent within and throughout a specified part of the United States. A transfer of either of these three kinds of interests is an assignment, properly speaking, and vests in the assignee a title in so much of the patent itself, with a right to sue infringers; in the second case, jointly with the assignor; in the first and third cases, in the name of the assignee alone. Any assignment or transfer, short of one of these, is a mere license, giving the licensee no title in the patent and no right to sue at law in his own name for an infringement." *Id.* at 255 [11 S.Ct. at 335]. Additionally, the Court noted that the term given to the agreement through which a patentee or his or her assigns transfers rights to a patent does not determine the transfer's legal effect. Instead, the Supreme Court cautioned that a court must examine the provisions con-

tained in the agreement.... *Id.* at 256 [11 S.Ct. at 335].

*Ciba–Geigy,* 804 F.Supp. at 630. "Whether one is an assignee or not is crucial because *the failure to assign all rights under the patent* bars a claim for infringement unless the owner is made party to the suit." *Afros,* 671 F.Supp. at 1444 (emphasis added). Consequently, whether Pfizer has standing as a matter of law to commence an infringement action without Bayer depends on the rights granted to Pfizer and the rights retained by Bayer under the Bayer/Pfizer Agreement.

In examining the Agreement, the Court notes that *Waterman* retains its vitality today [25] and directs this Court to disregard the "term" given to the Agreement in determining the legal effect of the transfer. *Accord Vaupel Textilmaschinen KG v. Meccanica Euro Italia, S.P.A.,* 944 F.2d 870, 874 (Fed.Cir.1991) (whether a provision in an agreement constitutes an assignment or a license is determined by the intention of the parties and the substance of what was granted); [26] *Maruzen,* 770 F.Supp. at 158 (whether an agreement transferring patent rights is an assignment or license is governed by its substance, not its label); *Afros,* 671 F.Supp. at 1444 (particular name given to instrument does not control its construction as a license or assignment). The substance of the rights granted and retained will determine the question of whether Pfizer has standing in its own right as a matter of law.

Instantly, Bayer owns the entire right, title and interest in and to the invention contained in the '986 patent. Bayer transferred certain rights to Pfizer under the Bayer/Pfizer Agreement, which is titled a "License Agreement." The relevant provisions pertaining to Pfizer's rights are ¶¶ 2.1 and 2.2. Paragraph 2.1 states:

---

**25.** "The *Waterman* rule is the settled law in the federal courts...." 6A Charles A. Wright et al., *Federal Practice and Procedure* § 1547, at 366 (1990). *Accord Raber v. Pittway Corp.,* 23 U.S.P.Q.2d 1313 (N.D.Cal.1992) (1992 WL 219016, at *2, 1992 U.S.Dist. LEXIS 6379, at *4) (explaining that modern courts continue to follow *Waterman* ).

**26.** Again, to the extent that the Court must necessarily determine Bayer's rights and obligations under the Agreement in construing the intention of the parties as to what rights were granted and retained, the Court concludes that Bayer is an indispensable party to this action under Fed.R.Civ.P. 19(b), as discussed in subsection II.C.

Subject to the terms and conditions of this License Agreement, BAYER agrees to grant and hereby *grants to PFIZER an exclusive, royalty bearing license to use and/or sell and,* subject to manufacturing rights of BAYER and/or BAYER's AFFILIATE, *an exclusive right to manufacture and/or have manufactured the COMPOUND, the PRODUCT and/or PFIZER's COMBINATION PRODUCT in the USA under BAYER's PATENT RIGHTS* [27] and to use for that purpose BAYER's KNOW–HOW; provided, however, that BAYER or BAYER's AFFILIATE shall, upon at least one hundred and eighty (180) days' notice to PFIZER, have a non-exclusive, royalty-free sublicense to manufacture, have manufactured, use and/or sell under BAYER's PATENT RIGHTS and BAYER's KNOW–HOW, said sublicense, however, only becoming effective at the earliest at least four (4) years after the date that PFIZER has the legal right to sell in the USA. BAYER or BAYER's AFFILIATE shall have the right to use PFIZER's KNOW–HOW under the sublicense.

D.I. 118, Ex. B. at ¶ 2.1 (emphasis added). By its terms, paragraph 2.1 grants to Pfizer an exclusive license to use, sell, make and have made the product under the '986 patent in the United States. Under paragraph 2.2, Pfizer is given the right to grant sublicenses to third parties in the United States.[28]

Paragraph 2.1 additionally retains specified rights for Bayer and/or its affiliate, including manufacturing rights, and the right to obtain a non-exclusive sublicense to use, sell, make or have made the product under the '986 patent in the United States. Pfizer concedes throughout its papers that Bayer has the right to obtain from Pfizer a sublicense for itself or its affiliate for the

United States. *See* D.I. 1 at ¶ 10, D.I. 42 at 5. According to Pfizer, after paragraph 2.1's four year period had passed, "Pfizer agreed to grant back to Bayer or its affiliate a non-exclusive royalty-free sublicense to manufacture, use or sell in the United States nifedipine or pharmaceutical products containing nifedipine," under the '986 patent, among others. D.I. 42 at 6. It is undisputed, therefore, that Bayer or one of its affiliates presently retains a non-exclusive sublicense to use, sell, make or have made a product under the '986 patent in the United States.

In construing whether a contract provides a licensee with enough rights to the patent to enable the licensee to bring a lawsuit, courts examine whether the transferor granted the transferee "essential rights to the patent." *Ciba–Geigy Corp. v. Alza Corp.,* 804 F.Supp. 614, 630 (D.N.J. 1992). *Accord Maruzen Int'l Co. v. Bridgeport Merchandise, Inc.,* 770 F.Supp. 155, 158 (S.D.N.Y.1991) (whether an agreement is an assignment depends on whether the agreement effectively transfers the entire bundle of rights residing in the patent). "These rights are the 'right of exclusivity, the right to transfer and most importantly the right to sue infringers.'" *Id.* (quoting *Calgon Corp. v. Nalco Chem. Co.,* 726 F.Supp. 983, 986 (D.Del.1989)) (other citations omitted). The Court will examine each in turn.

As to the right of exclusivity under *Waterman,* an agreement which grants the whole patent, comprising the exclusive right to make, use, and vend the invention throughout the United States, is considered an assignment, with a right to sue infringers. *Waterman,* 138 U.S. at 255, 11 S.Ct. at 335. At first blush, it would appear that the rights granted to Pfizer under paragraphs 2.1 and 2.2 of the Bayer/Pfizer Agreement constituted an assignment be-

---

**27.** It is undisputed that BAYER's PATENT RIGHTS as they are defined in the Agreement include the '986 patent.

**28.** Paragraph 2.2 provides in relevant part that: *PFIZER shall have the right hereunder to grant sublicenses to any third party for the USA* provided, however, that PFIZER has not been given notice by BAYER of default according

to 6.2; and provided furthermore, if PFIZER has been given notice of such default, PFIZER's right to grant sublicenses shall be reinstated upon PFIZER's remedying such default within sixty (60) days of receipt of such notice.

D.I. 118, Ex. B at ¶ 2.2 (emphasis added).

cause Pfizer was given the exclusive rights to make, have made, use and sell the invention under the '986 patent in the United States and the right to sublicense others under the patent in the United States. Pfizer indeed argues that under the *Waterman* test, it is an assignee of the '986 patent with standing to sue for infringement in its name alone.[29]

Pfizer's rights, however, are not exclusive. Bayer retained the title to the '986 patent. Bayer retained manufacturing rights under the patent for itself and/or its affiliate. Bayer additionally retained the right under the Agreement to obtain a non-exclusive, royalty-free sublicense for itself or its affiliate to make, have made, use and sell under the '986 patent in the United States. Bayer exercised the right to obtain a non-exclusive sublicense, and in fact obtained a sublicense under the Agreement. Like the plaintiff in *Calgon*, Pfizer's rights under the Agreement are subject to the right of Bayer or its affiliate to make and market products commercially under the '986 patent in the United States. *See Calgon*, 726 F.Supp. at 986. Thus, Pfizer's interests in the '986 patent within the United States are not exclusive, and the transfer of rights under the Agreement does not meet *Waterman's* definition of exclusivity.

The second factor in the analysis is the right to transfer. Instantly, Pfizer's right of transferability is governed by paragraph 9.1 of the Agreement. Paragraph 9.1 provides in relevant part that "[n]either party shall be entitled to assign its rights hereunder without the express written consent of the other party here-

to...." D.I. 118, Ex. B at ¶ 9.1. Under paragraph 9.1, Pfizer cannot assign its interests in the '986 patent without written permission from Bayer. In *Calgon*, the plaintiff could not assign its rights under the patent at issue without obtaining the transferor's written consent. *See Calgon*, 726 F.Supp. at 986. The court stated that "[j]ust as the right to alienate personal property is an essential incident of ownership, the right to further assign patent rights is implicit in any true assignment." *Id.* In light of this harsh restriction on alienation in the present case, this Court need look no further in determining that Bayer reserved substantial rights under the Agreement. *See, e.g., Raber v. Pittway Corp.*, 23 U.S.P.Q.2d 1313 (N.D.Cal. 1992) (1992 WL 219016, at *3, 1992 U.S.Dist. LEXIS 6379, at *8) (citation omitted).

The third factor concerns the right to sue infringers. Like the plaintiff in *Calgon*, Pfizer cannot commence an infringement action unless it first has notified Bayer of the infringement and given Bayer the opportunity to bring an action in Bayer's own name. *See Calgon*, 726 F.Supp. at 986. This requirement essentially amounts to a right of first refusal retained by Bayer to sue for infringement of the '986 patent. Notwithstanding this Court's conclusion that Pfizer has not complied with the conditions in the Agreement for bringing suit in its name alone, here, as in *Calgon*, Pfizer cannot be said to stand on "equal footing" with Bayer with respect to the right to sue when Pfizer's right to sue is conditioned upon Bayer's right of first refusal. *See id.* at 987.[30]

---

**29.** Pfizer's citation to *Maruzen Int'l Co. v. Bridgeport Merchandise, Inc.*, 770 F.Supp. 155, 158 (S.D.N.Y.1991), as support for its argument is unavailing. *Maruzen* teaches that labels are to be disregarded, and the substance of the rights transferred must be examined in determining whether there has been an assignment which grants the right to sue to the assignee in his own name, or merely the transfer of a license, which does not. *Id.* The court explained that "[w]here an agreement effectively transfers the *entire* bundle of rights residing in a patent, that agreement is an assignment." *Id.* (emphasis added) (citation omitted). *Maruzen* then held that an exclusive licensee who was assigned *all*

intellectual property rights in a patented invention obtained a complete assignment of the patent and had standing to sue in its own name. *Id.* Unlike the present case, under the assignment in *Maruzen*, the patent owner had reserved no rights to itself. *Id.*

**30.** Moreover, the language of paragraph 5.1 unequivocally shows that Bayer has reserved the right to sue for infringement under the Bayer/Pfizer Agreement. Upon an infringing sale and proper notice from Pfizer, and after the six month period has expired during which Bayer may take action against the infringer, the provision provides that "then upon request of PFIZ-

Pfizer attempts to distinguish *Calgon* by relying on the decision in *Vaupel Textilmaschinen KG v. Meccanica Euro Italia, S.P.A.*, 944 F.2d 870 (Fed.Cir.1991). At the outset, the Court observes that the rights retained by the patentee in *Vaupel* were not the type of substantial rights retained by Bayer. The *Vaupel* court held that the reserved rights (a veto right on sublicensing by the licensee, the right to obtain patents on the invention in other countries, a reversionary right to the patent in the event of bankruptcy or termination of production by the licensee and a right to receive infringement damages) were not so substantial as to reduce the transfer to a mere license or indicate an intent not to transfer all substantial rights. *Id.* at 875. This Court does not rest its conclusion on any of the types of rights cited in *Vaupel,* although Bayer retained some of the rights cited in *Vaupel.*[31] While Bayer did not retain the veto right over sublicensing, it retained the more substantial right to veto Pfizer's assignment of rights under the '986 patent.

The agreement in *Vaupel* granted the licensee the *sole* right to sue for past, present and future infringement, subject only to the obligation to inform the patentee. *Id.* at 874–75. The court found that the agreement's transfer of the right to sue for infringement was particularly dispositive because the ultimate issue confronting the court was whether the licensee could bring suit on its own or whether the patentee must be joined as a party. *Id.* at 875. The *Vaupel* court also reasoned that the policy underlying the requirement to join the owner, that of preventing the possibility of two suits on the same patent

against a single infringer, was not undercut because the right to sue rested solely with the exclusive licensee. *Id.* This situation is distinguishable from the present case, however, where Bayer retains the right of first refusal to institute suit against EPRC under the Bayer/Pfizer Agreement.

■ Because Bayer retained for itself title to the '986 patent, because Pfizer's interests in the '986 patent are not exclusive, because Pfizer does not have the right to assign its interests in the patent without Bayer's written consent, because Pfizer's right to sue for infringement is conditioned upon Bayer's right of first refusal, because Bayer retained the right to question whether infringing sales had occurred and because Bayer must grant to Pfizer the right to sue in its own name and execute whatever documents necessary to allow Pfizer to sue, Bayer has not transferred to Pfizer substantially all of its rights in the '986 patent under the Bayer/Pfizer Agreement.

Pfizer, therefore, is a licensee who cannot sue in its own name. Accordingly, Pfizer does not have standing to sue in its name for infringement of the '986 patent as a matter of patent law. Summary judgment as to Pfizer's standing as a matter of law to sue EPRC and Elan in the present action is granted to Defendants EPRC and Elan.

## C. BAYER IS AN INDISPENSABLE PARTY UNDER FED.R.CIV.P. 19(b)

Defendant EPRC raises another alternative argument related to standing. EPRC argues that even if Pfizer did have stand-

ER, BAYER will grant to PFIZER the right to prosecute an action against the infringer in PFIZER's own name." D.I. 118, Ex. B at ¶ 5.1. If Pfizer obtained the right to sue under the Agreement, it would be unnecessary for Bayer to *grant to Pfizer the right to sue an infringer in its own name.* The retention of this substantial right indicates that Bayer did not intend to assign to Pfizer the entire bundle of its rights in the '986 patent. Indeed, it was intended by the parties that evidence of Bayer's permission to sue would be needed to help effectuate Pfizer's standing. No other import can be ascribed to the provision of the Agreement that has reserved so much of the rights to the patent that

this licensee would need the "permission" of the owner to sue and the execution of all necessary documents to establish standing.

**31.** Here, Bayer did not grant to Pfizer patent rights in the '986 patent in countries other than the United States. *See* D.I. 118, Ex. B. Bayer retained a reversionary right to the '986 patent in the event of bankruptcy and also retained the right to fifty percent of any infringement damages in the event Bayer prosecuted an infringement action. *See id.* at ¶¶ 6.2 and 5.1, respectively.

ing to sue, Bayer is an indispensable party under Fed.R.Civ.P. 19(b) and, because Bayer was not joined as a plaintiff, the complaint should be dismissed.

■ "A patent owner should be viewed as a necessary party if it retains 'any interest' in the patent." *Erbamont Inc. v. Cetus Corp.*, 720 F.Supp. 387, 393 (D.Del. 1989) (quoting 5 D. Chisum, *Patents* § 21.03[3], at 21–167 (1988)). As discussed at length in subsection II.B., Bayer retained substantial rights in the '986 patent and Pfizer is a mere licensee under the Bayer/Pfizer Agreement.

Moreover, the Court finds that under Rule 19(a), as a practical matter, the disposition of the action in Bayer's absence may impair or impede Bayer's ability to protect that interest. In the absence of Bayer, Pfizer disputes numerous issues related to standing arising from its license agreement with Bayer, not the least of which is Pfizer's interpretation of whether an infringing sale is a prerequisite to Pfizer's right to sue for infringement. Pfizer additionally contests whether it gave proper notice as a condition of the Agreement prior to acquiring the right to sue for infringement in its own name. Finally, Pfizer arguably contests the transferor's intent under the Bayer/Pfizer Agreement as to whether Pfizer, the transferee, is a licensee or assignee. All of these items turn on Pfizer's interpretations and arguments as to the intent and construction of the Bayer/Pfizer Agreement.

The only evidence before the Court from the perspective of Bayer is its February 7, 1991 letter to Pfizer and Bayer's July 28, 1992 letter to EPRC's outside counsel, both of which state that in Bayer's opinion, Pfizer has yet to comply with the notice provisions of paragraph 5.1 as they relate to the instant suit. The fact that Bayer disputes many items related to Pfizer's standing is demonstrated conclusively by the evidence of the parties' correspondence related to this action and discussed at length in subsection II.A.

Bayer plainly contests that Pfizer has the right to proceed presently. Contrary to Pfizer's assertion that Bayer has acquiesced to Pfizer's suing the Defendants in its own name, EPRC produced a letter from Bayer dated after the filing of Pfizer's infringement action which confirms that the parties dispute whether Pfizer has the right to pursue this action. In the light of these very obvious disputes between the parties to the license agreement, it is more appropriate that they be resolved pursuant to the terms of the Agreement which mandates arbitration.

■ The Court further finds that due to Bayer's interest in the '986 patent, disposition of the action in Bayer's absence may leave the Defendants subject to a risk of incurring double or otherwise inconsistent obligations. Such a risk arises because Pfizer has failed to demonstrate that the right to sue these Defendants for infringement of the '986 patent vests entirely in Pfizer thereby eliminating the risk of inconsistent obligations.

Once a party is deemed necessary under Rule 19(a), a court must undertake the second step of the analysis, *i.e.*, if the party cannot be joined because it is not subject to process,[32] then the court must consider in equity and good conscience whether the party is indispensable and dismissal appropriate. Fed.R.Civ.P. 19(b); *Vaupel Textilmaschinen KG v. Meccanica Euro Italia, S.P.A.*, 944 F.2d 870, 876 n. 1 (Fed.Cir. 1991); *Suprex Corp. v. Lee Scientific, Inc.*, 660 F.Supp. 89, 93 (W.D.Pa.1987).

"A patent owner has long been held to be an indispensable party in an enforcement action by its licensee." *Suprex*, 660 F.Supp. at 94 (citations omitted). In this case, the Court is presented with extensive evidence that Pfizer and Bayer dispute Pfizer's standing to sue the Defendants for infringement of the '986 patent. A determination by this Court that Pfizer has standing under paragraph 5.1 of the Bayer/Pfizer Agreement and as a matter of

---

**32.** No showing has been made to this Court that Bayer is subject to service of process of the Court.

patent law to sue in its own name instantly would fix the rights and obligations of Bayer under the Agreement in Bayer's absence. Indeed, the Court would be resolving disputes and determining the rights and obligations of the parties under the Agreement when the parties themselves have agreed to resolve these matters by arbitration. Such a finding comports with the first factor a court considers for a Rule 19(b) analysis, *i.e.*, to what extent a judgment rendered in the absence of a necessary party might be prejudicial to him or those already parties. This factor weighs so strongly against Pfizer under the totality of circumstances of the instant action that it renders unnecessary an analysis of the remaining three factors under Rule 19(b).

Other courts have held that where there is a dispute regarding the terms and conditions of the patent transfer, *i.e.*, whether the transferee is a licensee or assignee, it would be improper under Fed.R.Civ.P. 19 to make such a determination absent evidence from the transferor. *Refac Int'l, Ltd. v. Mastercard Int'l*, 758 F.Supp. 152, 157 (S.D.N.Y.1991) (citing *Dentsply Int'l, Inc. v. Centrix, Inc.*, 553 F.Supp. 289, 294 (D.Del.1982) (in determining if a patentee is an indispensable party, the critical focus is upon the entity who is the real party in interest in the controversy)).

Thus, if the Court had not concluded that Pfizer lacks standing on the grounds previously discussed, the Court alternatively concludes that in equity and good conscience, Bayer is an indispensable party to any resolution of the issues raised herein at this juncture of the proceedings. Additionally, any disputes between Pfizer and Bayer related to the Bayer/Pfizer Agreement and rights thereunder for the '986 patent are more appropriately resolved through arbitration as provided for in the Agreement.

### III. CONCLUSION

For the reasons stated herein, the Defendants' motion for summary judgment on the ground of Pfizer's lack of standing, in the absence of Bayer as a party, is granted.

An order in accordance with this opinion shall be entered.