McNEILAB, INC.

v.

SCANDIPHARM, INC.

No. 92–7403.

United States District Court, E.D. Pennsylvania.

Sept. 6, 1994.

Joseph Lucci, Philip S. Johnson, Barbara L. Mullin, Woodcock, Washburn, Kurtz, Mackiewicz & Norris, Philadelphia, PA, for plaintiff.

Michael T. Scott, Lucile H. Lynch, Reed, Smith, Shaw & McClay, Philadelphia, PA, Beverly B. Goodwin, Darby & Darby, P.C., Anthony F. Phillips, Roger D. Netzer, James H. Bicks, Joanne Chormanski, Willkie, Farr & Gallagher, New York City, for Scandipharm, Inc., Eurand Intern., S.P.A.

Richard M. Squire, Philadelphia, PA, Myron Kirschbaum, Fred A. Freund, Robert M. Grass, Kaye, Scholer, Fireman, Kayes and Handler, New York City, for BASF Aktiengesellschaft.

### MEMORANDUM and ORDER

SHAPIRO, District Judge.

Plaintiff McNeilab, Inc. ("McNeil") brought this action for patent infringement against defendant Scandipharm, Inc. ("Scandipharm") under the Patent Laws of the United States, Title 35 United States Code. Presently before the court is defendant's Motion for Summary Judgment. Because the undisputed material facts show that plaintiff lacks standing to maintain this action, defendant's motion will be granted.

## I. BACKGROUND

McNeil is a Pennsylvania corporation with its principal place of business in Pennsylvania. BASF Aktiengesellschaft ("BASF"), a German corporation, is the record owner of the patents in suit. The patents relate to

certain microtablets containing pancreatic enzymes that assist the digestion of fat. In 1988, McNeil entered into an agreement with a wholly owned subsidiary of BASF, Knoll Aktiengesellschaft ("KAG"), for production and marketing of these microtablets which McNeil then marketed under the brand name "Pancrease MT."

In 1990, when BASF's European patent application was pending, Eurand International, S.p.A. ("Eurand"), an Italian corporation, was developing "minitablets" containing pancreatic enzymes. BASF and Eurand entered into negotiations to avert conflicts over the marketing and sale of their respective products. BASF stated in a letter to Eurand dated May 4, 1990, that BASF would not assert its European patents or their equivalents in other countries against Eurand, its affiliated companies, or their customers if Eurand's minitablets conformed to certain specifications. BASF stated in another letter to Eurand on May 10, 1990, that licensees of KAG would not assert the European patents against Eurand's marketing of the pancreatic enzyme tablets in the form referred to in the May 4th letter. Eurand then signed the May 4th letter ("Letter Agreement") and returned it to BASF.

Eurand markets pancreatic enzymes in minitablets under the brand name Ultrase. In July, 1991, Eurand granted Carlson-Rensselaer Corporation ("C–R"), a Pennsylvania corporation, an exclusive right to market Ultrase Minitabs in the United States and Canada. On August 5, 1991, C–R granted Scandipharm, a Delaware corporation with its principal place of business in Alabama, the exclusive right to register, manufacture, and market Ultrase Minitabs in the United States.

McNeil subsequently filed this action for patent infringement against Scandipharm. Scandipharm asserted a counterclaim seeking a declaration of patent invalidity and noninfringement and a third party complaint against BASF. Scandipharm contended that it was a third party beneficiary of the Letter Agreement and relied on the Letter Agreement and other representations that it would not be sued for patent infringement. Eurand filed a motion to intervene as third party plaintiff against BASF. The court granted BASF's motion to dismiss Scandipharm's third party complaint because Scandipharm's claims against BASF were independent of McNeil's claims against Scandipharm and the third party complaint did not state a claim for contributory infringement under 35 U.S.C. § 271(c).[1] Memorandum and Order of June 17, 1993. The court denied Eurand's motion to intervene as moot. *Id.*

## II. FACTS

BASF is the record owner of United States Patent Number 4,797,287 and 4,828,843, acquired respectively on January 10, 1989 and May 9, 1989. Def. Ex. B. The former patent is for a cylindrical microtablet of specified proportions consisting "essentially of pancreatin," with a dependent claim for a microtablet with a pancreatin content of 99.5%. *Id.* The latter patent is for a microtablet of the same composition and proportions as the first patent with a coating resistant to gastric juices, with a dependent claim for a microtablet with a specified coating. *Id.*

On April 19, 1988, KAG and McNeil entered into a "Know–How and License Agreement," Def. Ex. A ("License Agreement"); according to McNeil, the License Agreement transferred rights to the BASF patents to McNeil. Scandipharm disputes McNeil's assertion that BASF authorized KAG to license rights to the patents in suit; however, the evidence of record suffices to create a disputed issue of fact regarding KAG's licensing authority. *See, e.g.,* Pl.Ex. 9 at 158, 186–90. For this motion for summary judgment, the court must assume that BASF did grant KAG licensing authority.

Section 3.1 of the License Agreement states in part: "KAG hereby grants to McNeil a right and license to use the Know–How relating to the Product and the Patent

1. The court declined to find a right of action for contribution under federal patent law where not expressly provided by statute.

Rights to make, use and sell the Product within the Territory. Such right and license shall be exclusive."

The License Agreement contains the following definitions:

"Product" means the finished pharmaceutical specificity containing the Compound formulated into micro-tablets in capsules conforming to the specifications and data analyses attached hereto as Exhibit I as well as any improvement thereof according to Section 6.8. Exhibit I shall be amended accordingly.

. . . .

"Combination Product" means a Product which contains at least one other active ingredient in addition to the Compound. "Compound" means Pancrelipase that conforms to the specifications and data analyses attached hereto as Exhibit II. Exhibit II may be amended at any time by KAG with respect to improved lipase activity.

. . . .

"Patent Rights" means any patent issued based on a patent application previously or hereafter filed by or on behalf of KAG or subsequently assigned, licensed or granted to KAG in the Territory, that is based on an invention relating to the manufacture or use of the Compound or Product, but only to the extent that said patents or the claims thereof cover the Compound or Product, their use, or a process for their manufacture. . . .

"Territory" means the United States of America, its territories, and possessions, and Canada.

"Trademark" means McNeil's trademark 'Pancrease' used in conjunction with appropriate suffixes to designate and differentiate KAG's pancrelipase formula and strengths (e.g. 'Pancrease MT4', 'Pancrease MT12', 'Pancrease MT25').

License Agreement Art. I.

Pancrelipase is a substance containing enzymes, principally lipase, with amylase and protease. License Agreement, Ex. II. Exhibit Ia to the License Agreement sets out a potency range of 450–530 F.I.P.–U [2] of lipase per tablet, a minimum of 360 F.I.P.–U of amylase per tablet, and a minimum of 22 F.I.P.–U of protease per tablet.

Section 8.1 of the License Agreement gives McNeil the right to manufacture the Product after least thirty months from the date of McNeil's first sale of the Product in the Territory but no less than the time period required for McNeil to purchase in the aggregate 800 billion Lipase units from KAG. McNeil must provide six months notice to KAG of a decision to manufacture the Product. License Agreement § 8.1(b).

Section 3.1 of the License Agreement also states: "McNeil shall not grant a sub-license without prior written consent of KAG." Section 12.7 of the License Agreement states: "The rights and obligations under this Agreement shall not be assigned in part or in whole except to an Affiliate of McNeil or KAG without the advance written consent of the other party."

Section 6.10 of the License Agreement states in relevant part:

Nothing in this Agreement shall be construed as:

. . . . .

(b) an obligation to bring or prosecute actions or suits against third parties for infringement. However, should KAG choose not to enforce any of the rights licensed to McNeil hereunder within a reasonable amount of time after learning of such infringement, McNeil shall be permitted to bring or prosecute such actions or suits in its own right and with the right to retain all awards recovered thereby.

Section 12.11 of the License Agreement states: "This Agreement shall be governed by and construed and interpreted according to the laws of the Federal Republic of Germany."

### III. DISCUSSION

#### A. Summary Judgment Standard

Summary judgment may be granted only if there exists "no genuine issue of material fact and the moving party is entitled to judg-

---

**2.** "F.I.P." is Germany's standard enzyme activity unit. *See* Pl.Ex. 46.

ment as a matter of law." Fed.R.Civ.P. 56(c). The non-moving party must provide evidence of record beyond the pleadings to establish an issue of material fact on "an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Not every issue of fact will defeat summary judgment. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The non-moving party must come forward with "more than a mere scintilla of evidence in its favor" and " 'cannot simply reassert factually unsupported allegations contained in its pleading.' " *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.1989) (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510; *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554). In deciding a motion for summary judgment, the court must construe the facts and inferences therefrom in the light most favorable to the non-moving party. *Pollock v. AT & T*, 794 F.2d 860, 864 (3d Cir.1986).

## B. Choice of Law

■ Section 12.11 of the License Agreement states that the Agreement shall interpreted according to the laws of the Federal Republic of Germany. Neither party provided notice that it intended to raise an issue of foreign law as required by Rule 44.1 of the Federal Rules of Civil Procedure, nor did either party refer to German law in any proceeding before the court except when the court raised the issue at oral argument. When neither party proves with reasonable certainty the substance of foreign principles of law, it is generally appropriate to apply the law of the local forum. *See Banque Libanaise Pour Le Commerce v. Khreich*,

915 F.2d 1000, 1006 (5th Cir.1990); *Carey v. Bahama Cruise Lines*, 864 F.2d 201, 205–06 (1st Cir.1988) (where parties are silent regarding application of foreign law, court should apply the law of the forum if the forum state bears a reasonable relationship to the dispute and the parties are not attempting to escape a foreign sovereign's policy interests); *Commercial Ins. Co. v. Pacific–Peru Constr. Corp.*, 558 F.2d 948, 952 (9th Cir.1977); *Pfizer, Inc. v. Elan Pharmaceutical Research Corp.*, 812 F.Supp. 1352, 1360–61 & n. 12 (D.Del.1993); Restatement (Second) of Conflicts of Laws § 136, cmt. h (1971)).

■ In a contract action, Pennsylvania courts apply the law of the forum having the most interest in the litigation and the most concern with the outcome. *In re Complaint of Bankers Trust Co.*, 752 F.2d 874, 882 (3d Cir.1984). McNeil is a Pennsylvania corporation with its principal place of business in Pennsylvania, and the License Agreement requires that KAG send in writing all notices, requests, demands, certificates, or other communications to McNeil in Pennsylvania. Because no state has a greater interest in the interpretation of the contract than Pennsylvania, the court will apply Pennsylvania law.[3]

■ Under Pennsylvania law, a contract must be interpreted in accordance with the meaning ascribed to it by the parties; the parties' intent is determined from the entire agreement. *Linder v. Inhalation Therapy Services, Inc.*, 834 F.2d 306, 311 (3d Cir. 1987). Extrinsic evidence is considered only if the language of the contract is ambiguous. *Id.*

## C. Standing

The standing requirement is statutory: "A *patentee* shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281 (emphasis supplied). "Patentee" is defined as including "not only the patentee to whom the patent was issued but also the successors

---

**3.** At oral argument, the parties stated that they did not believe the application of Pennsylvania rather than German law of contract interpretation would affect the outcome of defendant's summary judgment motion. *Cf. Walter v. Nether-* *lands Mead N.V.*, 514 F.2d 1130, 1137 n. 14 (3d Cir.) (assuming that foreign law was consistent with the law of the forum when parties made no effort to prove the foreign law), *cert. denied*, 423 U.S. 869, 96 S.Ct. 133, 46 L.Ed.2d 99 (1975).

in title to the patentee." 35 U.S.C. § 100(d). An assignee may have sufficient rights to be a "successor in title" to the patent, but a licensee does not. *See REFAC Int'l v. Visa USA Inc.,* 16 U.S.P.Q.2d 2024, 2027, 1990 WL 130032 (N.D.Cal.1990).

It has long been established that an assignee of the patent holder may sue for infringement in its own name, but a licensee may not. *See Waterman v. Mackenzie,* 138 U.S. 252, 255, 11 S.Ct. 334, 335, 34 L.Ed. 923 (1891); *Pfizer,* 812 F.Supp. at 1370; *Raber v. Pittway Corp.,* 23 U.S.P.Q.2d 1313, 1314, 1992 WL 219016 (N.D.Cal.1992), *aff'd,* 996 F.2d 318 (Fed.Cir.1993). A transfer constitutes an assignment if the transferee receives "all *substantial* rights" to the patent; otherwise, the transfer is a mere license. *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.,* 944 F.2d 870, 874 (Fed.Cir.1991) (emphasis supplied). Whether a transfer of rights constitutes an assignment or a license depends on the substance of the agreement rather than what the agreement calls itself. *Waterman,* 138 U.S. at 255, 11 S.Ct. at 335; *Vaupel,* 944 F.2d at 875.

The three primary rights of a patent holder are: (1) the exclusive right to make, use, and sell under the patent; (2) the right to transfer; and (3) the right to sue infringers. *Calgon Corp. v. Nalco Chemical Co.,* 726 F.Supp. 983, 986 (D.Del.1989) (citing *Crown Die & Tool Co. v. Nye Tool & Machine Works,* 261 U.S. 24, 35–39, 43 S.Ct. 254, 256–58, 67 L.Ed. 516 (1923)); *Raber,* 23 U.S.P.Q.2d at 1314. A condition subsequent that may terminate an exclusive license does not determine whether the agreement transfers essential rights to the patent. *Waterman,* 138 U.S. at 256, 11 S.Ct. at 335; *Vaupel,* 944 F.2d at 875.

If the transferor retains a certain level of patent rights, the transfer is merely a license and the transferee lacks standing to sue for infringement. In *Pfizer,* the transferee lacked standing because the transferor retained a non-exclusive sublicense to make, use, or sell products under the patent, a veto right over assignment, the right of first refusal to sue for infringement, a reversionary right to the patent in the event of bankrupt-

cy, and a right to half of any infringement damages obtained by the transferee. *Pfizer,* 812 F.Supp. at 1371–74. *See also Raber,* 23 U.S.P.Q.2d 1313 (transferee lacked standing where transferor retained non-cancelable, royalty-free license under the patent, the right to grant sublicenses to its subsidiaries, and veto power over assignment); *REFAC,* 16 U.S.P.Q.2d 2024 (transferee lacked standing where transferee obtained exclusive right to make, use and sell under the patent but was prohibited from assigning its rights to other than a successor company and was required to share any proceeds from infringement suits with the transferor; the transferor retained the right to terminate the agreement "under a variety of circumstances"); *Calgon,* 726 F.Supp. at 986–87 (transferee lacked standing where the transferor and its affiliates retained the right to make and market products under the patent in the United States and the transferor retained a veto power over assignment and right of first refusal to sue for infringement).

The failure to transfer all possible rights under the patent does not necessarily deprive the transferee of the right to sue for infringement. In *Vaupel,* the transferee obtained the exclusive right to make, use, and sell under the patent but had to notify the transferor before suing for infringement; the transferor retained the right to obtain patents on the invention in other countries, a reversionary right to the patent in certain circumstances, a right to receive infringement damages, and veto power over sublicensing. *Id.* at 874–76. Nevertheless, the court found that the transferee possessed all essential patent rights. *See also Aluminum Co. of Am. v. Norton Co.,* 27 U.S.P.Q.2d 1317, 1993 WL 330628 (W.D.Pa.1993) (transferee had standing to sue for infringement where transferor retained a non-exclusive royalty free right to make, use, and sell products under the patent, retained veto power over assignment but not sublicensing, and required six months notice prior to transferee's suing for infringement); *Ciba–Geigy Corp. v. Alza Corp.,* 804 F.Supp. 614, 617–18, 633–35 (D.N.J.1992) (transferee had standing to sue for infringement where transferor retained the right to use the patent for educational

purposes but had no veto power over sublicensing and could not unreasonably withhold consent for assignment; transferee could not sue in own name without the transferor's consent within five days of notice to transferor).

### 1. Right to Transfer

■ The License Agreement prohibits McNeil from: 1) assigning its patent rights, except to an "affiliate," without the prior written consent of KAG; and 2) granting any sub-license without prior written consent of KAG. KAG's retention of these veto powers substantially impairs McNeil's claim that it is an assignee, for "[j]ust as the right to alienate personal property is an essential incident of ownership, the right to further assign patent rights is implicit in any true assignment." *Calgon*, 726 F.Supp. at 986.

In *Vaupel*, the transferor retained a veto over sublicensing only; the court found that a sublicensing veto was "a minor derogation from the full grant of rights." *Vaupel*, 944 F.2d at 875. KAG, however, has retained not only a sublicensing veto but also "the more substantial right to veto ... assignment of rights." *Pfizer*, 812 F.Supp. at 1374. Both the *Pfizer* and *Raber* courts concluded that veto power over assignment alone constituted retention of "substantial rights" under the parties' agreement. *Pfizer*, 812 F.Supp. at 1373; *Raber*, 23 U.S.P.Q.2d at 1315; *see also REFAC*, 16 U.S.P.Q. at 2028 (absolute prohibition of assignment by transferee except to a successor corporation constituted retention of substantial rights by transferor).

The restrictions on McNeil's right to transfer are also more substantial that those in *Aluminum Co. of America* and *Ciba–Geigy*, in which the courts found that the transferee did have standing. In both *Aluminum Co. of America* and *Ciba–Geigy*, the transferor retained a veto over assignment alone; KAG has retained a veto over both assignment and sublicensing by McNeil. In *Ciba–Geigy* the transferor could not unreasonably withhold its consent to assignment; KAG's right to exercise its veto is absolute unless the assignment is to a McNeil affiliate.

### 2. Right to Sue

McNeil did not obtain an unrestricted right to sue for patent infringement under the License Agreement. The License Agreement states that neither party is obliged to bring an action for infringement, but "should KAG choose not to enforce any of the rights licensed to McNeil hereunder within a reasonable amount of time after learning of such infringement, McNeil shall be permitted to bring or prosecute such actions or suits in its own right and with the right to retain all awards recovered thereby." License Agreement § 6.10(b). McNeil may not sue under the contract unless KAG learns of the alleged infringement and chooses not to enforce its rights.[4] This restriction on McNeil's right to sue is a significant retention of rights by KAG.

In *Vaupel*, the transferee had the right to sue for infringement upon notice to the transferor; the court concluded that "the right to sue rested solely with" the transferee. *Vaupel*, 944 F.2d at 875–76. KAG, however, has retained a right of first refusal to sue for infringement; the right to sue therefore rests with KAG, not McNeil.

McNeil argues that the importance of any right of first refusal retained by KAG is moot because the conditions under the License Agreement for McNeil to sue have been satisfied, but the satisfaction of required conditions precedent to sue in a particular instance is not relevant to the standing issue. The assignment/license inquiry focuses on the totality of patent rights acquired by the transferee in its agreement with the transferor, not on whether certain conditions in the agreement have been met with respect to the specific alleged infringement in suit. *See Pfizer*, 812 F.Supp. at 1373 ("[n]otwithstanding" transferee's failure to comply with conditions in agreement for suing in own name, agreement did not place transferee on equal

---

4. If McNeil had obtained an unrestricted right to sue for infringement under the License Agreement, there would have been no need for KAG to grant McNeil the right to sue after KAG learned of infringement and chose not to enforce its rights within a reasonable amount of time. *See Pfizer*, 812 F.Supp. at 1373 n. 30.

footing with transferor regarding right to sue for infringement); *Calgon,* 726 F.Supp. at 986–87 (even though it was unclear whether plaintiff had complied with conditions in agreement to sue in own name, "[a]t any rate" the agreement did not grant plaintiff equal footing with the title holder regarding the right to sue).

McNeil also argues that there is no threat of inconsistent judgments or multiple suits against Scandipharm if McNeil is allowed to maintain this action. BASF/KAG, knowing of Eurand's allegedly infringing product, negotiated with Eurand to resolve potential disputes regarding BASF's European patent and its foreign equivalents, Pl. Exs. 13–23; their Letter Agreement stated that BASF would not assert its European patent or its equivalents in other countries against Eurand, its affiliated companies, or their customers, Pl.Ex. 23; and BASF also agreed prior to dismissal from this action not to bring any other suit for infringement against Eurand or Scandipharm and to be bound by any judgment in this action regarding infringement or validity of the patents. Pl.Ex. 38 ¶ 4.

The issue now is not whether McNeil could join BASF,[5] but whether McNeil may sue for infringement without joining BASF as the record owner of the patents. Preventing multiple suits on the same patent against a single infringer is an important policy underlying the requirement that an exclusive licensee suing for infringement must join the patent owner. *Vaupel,* 944 F.2d at 875 (citing *Crown Die & Tool Co.,* 261 U.S. at 38, 43 S.Ct. at 257). But before a transferee may sue for infringement independent of the patent holder, it must have received sufficient rights to a patent in order to have standing as a title holder to maintain an infringement suit under the statute, even if there is no threat of inconsistent judgments or multiple suits. *See* 35 U.S.C. §§ 100(d), 281.

This issue is resolved by examining the rights transferred to McNeil by the License Agreement. BASF's surrender of its right to sue this particular defendant and its

agreement to be bound by a decision regarding infringement or validity of the patents in suit does not give McNeil additional rights under the License Agreement and does not bear on the standing issue.

In most instances where a transferee sues for patent infringement, the transferor is also in a position to enforce the patent. In this unusual case, BASF/KAG has apparently prevented itself from enforcing the patent rights that it purported to license exclusively to McNeil. The court has no opinion regarding any action McNeil may have against BASF/KAG.

3. Right to Make, Use, and Sell under the Patents

The significant restrictions on McNeil's right to transfer its patent rights and its right to sue for infringement may suffice to conclude that McNeil lacks standing to maintain this action. But McNeil also did not receive the right to make, use, and sell all embodiments of the patented inventions; instead, the License Agreement transferred the right to make, use, and sell a specified product, that is, only a portion of the claims covered by the patents.

Section 3.1 of the License Agreement grants McNeil an exclusive right and license to "the Patent Rights to make, use and sell the Product within the Territory," and section 8.1 of the License Agreement gives McNeil the option of manufacturing the Product upon fulfillment of certain conditions. The License Agreement does not transfer the right to make, use, and sell all forms of the inventions under the Patent Rights defined by the License Agreement; McNeil may use its Patent Rights only to make, use and sell the Product and has the option of manufacturing only the Product.

The definition of Patent Rights does not broaden McNeil's right to make, use, and sell under the patents in suit. The License Agreement defines "Patent Rights" as "any patent ... that is based on an invention relating to the manufacture or use of the

---

**5.** Joinder of BASF may not be practicable because of the Letter Agreement between BASF and Eurand.

Compound or Product, but only to the extent that said patents or the claims thereof cover the Compound or Product, their use, or a process for their manufacture." Although the *definition* of Patent Rights appears to include the rights to the BASF patents in suit (the BASF patents relate to and cover the manufacture or use of the Compound or Product), the *definition* of Patent Rights in the License Agreement is not the *grant* of rights to McNeil.

McNeil argues that its patent rights are not limited to the Product because the definition of Patent Rights include patents relating to the Compound as well as the Product. But the definitional paragraph regarding Patent Rights is not the paragraph granting rights to McNeil. Section 3.1, the section of the License Agreement that does grant rights, transfers rights to the Product not the Compound; that section transfers patent rights to the Compound only to the extent that "Product" includes the Compound by definition.

If the Product is narrower than the invention embodied by the patents in suit and if McNeil's rights are limited to that narrower category, then the License Agreement does not transfer the right to make, use, and sell all embodiments of the patented invention. The License Agreement defines the "Product" as the Compound formulated into microtablets in capsules conforming to the specifications and data analyses in Exhibit I as well as any improvement according to Section 6.8 of the License Agreement; the Agreement also provides that Exhibit I "shall be amended accordingly." Exhibit Ia specifies that each microtablet should contain 450–530 F.I.P.–U of lipase, a minimum of 360 F.I.P.–U of amylase, and a minimum of 22 F.I.P.–U of protease. Because the definition of the Product specifically incorporates the specifications of Exhibit I, the Product consists only of microtablets containing the potency ranges listed in Exhibit Ia.

Scandipharm has contended that the invention embodied by the patents—a microtablet consisting "essentially of pancreatin"—is broader than the Product which is limited to the various enzyme potency ranges as listed in Exhibit Ia.[6] McNeil has offered no evidence from which to conclude that the potency ranges listed in Exhibit Ia encompass all microtablets consisting essentially of pancreatin; the court concludes that the Product, microtablets with potency ranges listed in Exhibit Ia, is not as broad as the invention embodied by the patents.

Because the License Agreement transferred the right to make, use and sell only the Product, McNeil did not acquire the right to make, use or sell microtablets with potency ranges outside the limits described in Exhibit Ia and so did not acquire the full rights to make, use, and sell under the patents. Although the definition of Product expressly contemplates "improvements" to be incorporated as amendments to the specifications in Exhibit I to the License Agreement, there has been no amendment providing for a wider potency range for the Product than that specified in Exhibit Ia.

McNeil points to an amendment to the License Agreement stating that "the *examples* provided in the definition of the trademark under Article I are amended to: 'Pancrease MT 4', 'Pancrease MT 10', and 'Pancrease MT 16'. . . . [T]his should not be construed as a limitation on the product strengths which McNeil may market in the Territory." Exhibit I to the License Agreement states that Pancrease MT 4 has an average of 13 microtablets per capsule, Pancrease MT 10 has an average of 33 microtablets per capsule, and Pancrease MT 16 has an average of 52 microtablets per capsule. These "examples" would seem to vary product strength by adjusting the number of microtablets per capsule, not by adjusting the strength of individual microtablets. McNeil has not established that these "examples" or any other provision in the amendment allow McNeil to vary the microtablet potency requirements of Exhibit Ia.

6. For the purpose of this motion, Scandipharm has withdrawn its contention that the Patent Rights do not include any rights to the BASF patents because the patents refer to pancreatin while the Product contains the Compound which is defined as pancrelipase. *See* Def. Motion for Summary Judgment at 14 n. 6.

■ McNeil argues that KAG and McNeil believed that the License Agreement transferred an exclusive license to the entirety of the patents in suit to McNeil. *See* Pl.Ex. 9 at 165; Pl. Exs. 45, 46, 48, 50, 51. This argument is based on several documents and statements extrinsic to the License Agreement itself. The License Agreement clearly grants exclusive patent rights to make, use, and sell only the Product, not any microtablet containing pancreatin. Because the language of the License Agreement is unambiguous on this issue, extrinsic evidence of the intent of the parties is not admissible. *See Linder·v. Inhalation Therapy Services, Inc.*, 834 F.2d 306, 311 (3d Cir.1987).[7]

McNeil contends that even if the License Agreement grants the right to make, use, and sell only microtablets within a certain potency range, such an exclusive grant still allows McNeil to sue in its own name against those making, using, or selling allegedly infringing products within that range. However, the Supreme Court held in *Pope Manufacturing Co. v. Gormully & Jeffery Manufacturing Co.*, 144 U.S. 248, 12 S.Ct. 641, 36 L.Ed. 423 (1892), that where a patent owner transferred only one of the patent's several claims, the transferee did not have standing to sue for infringement even for violation of the particular claim transferred.

■ A grant of patent rights restricted to a particular field of use does not confer standing on the transferee to sue potential infringers even within that particular field. *See Etherington v. Hardee*, 290 F.2d 28 (5th Cir.1961); *Channel Master Corp. v. JFD Electronics Corp.*, 260 F.Supp. 568, 571–72 (E.D.N.Y.1966). *But see Brunswick Corp. v. United States*, 22 Cl.Ct. 278, 283 (1991) (an exclusive patent licensee under a use limitation has standing to sue for infringement where patent owner has actual notice of suit

7. On February 7, 1994, while this motion was pending, KAG and McNeil entered into an "Addendum to Know–How License and Supply Agreement Between Knoll AG and McNeilab, Inc." Pl.Ex. 57. The Addendum states that the parties, "intending to be legally bound, hereby clarify ... that Section 3.1 of the [License] Agreement grants to McNeil ... the Patent Rights to make, use and sell the Product within the Territory," and that this·right is exclusive and includes the BASF patents in suit. *Id.* The

and refuses without any cause to join the action); *Pratt & Whitney Co. v. United States*, 153 F.Supp. 409, 411, 139 Ct.Cl. 540 (1957) (exclusive licensee of patent for a limited use has the right to maintain an action in name of licensor for unlawful use of patent within the limited field, notwithstanding refusal of licensor to join the suit).

McNeil received rights to make, use, and sell only a portion of the inventions covered by the patent claims. If the right to one of several patent claims was not sufficient to confer standing in *Pope*, then rights to portions of claims are also insufficient.

### 4. Termination Clause

■ At the request of the court, the parties submitted supplemental briefs on the import of the License Agreement's termination clause on McNeil's standing. The Agreement lasts until December 31, 1998, on which date it is automatically renewed for two additional years unless terminated by either party with twelve months advance notice. License Agreement § 10.1. Either party may terminate the agreement on ninety days written notice of default by the other party if there is failure to cure the default within the ninety day period. License Agreement § 10.2(a). Either party may terminate the Agreement immediately if the Agreement becomes void or unenforceable as a result of governmental action, if unreasonable burdens or excessive liabilities are imposed on a party with respect to its performance, or if the other party is insolvent, bankrupt, or liquidated. License Agreement § 10.2(b), (c). KAG may terminate the Agreement if McNeil Pharmaceutical Division becomes unaffiliated with Johnson & Johnson. License Agreement § 10.2(d).

Addendum also states it "is not intended to amend the Agreement, but rather, to clarify the substance of what was granted to McNeil under the Agreement." Because the terms of the License Agreement are unambiguous and the Addendum does not amend the License Agreement, the Addendum is an extrinsic statement of the parties' intent which does not change the substance of the rights that were granted to McNeil under the Agreement.

"An assignment of a patent 'may be either absolute, or by way of mortgage and liable to be defeated by non-performance of a condition subsequent....'" *Vaupel,* 944 F.2d at 875 (quoting *Waterman,* 138 U.S. at 256, 11 S.Ct. at 336). There is nothing to distinguish the termination provisions of this License Agreement from ordinary conditions subsequent; they do not prevent a transfer of rights from constituting an assignment. The termination provisions are not relevant and were not considered in determining McNeil's standing to maintain this action.

## IV. CONCLUSION

The significant restrictions on McNeil's right to transfer rights to the BASF patents and sue for infringement of those patents render the rights granted to McNeil a license rather than an assignment of patent rights; consequently, McNeil lacks standing to maintain this infringement action. McNeil did receive some exclusive rights to make, use, and sell under the patents in suit, but such rights were limited to the Product, which has a specific potency range; McNeil did not obtain the right to make, use, and sell all embodiments of the patented invention. This reenforces the conclusion that McNeil lacks sufficient patent rights to maintain this infringement action.[8]

Defendant's Motion for Summary Judgment will be granted. An appropriate order follows.

---

8. Scandipharm also argues that: KAG could divest McNeil of any rights to the BASF patents by supplying microtablets with a shape falling outside the scope of the patents; McNeil's right to manufacture the Product is further weakened because it is subject to several conditions under § 8.1 of the License Agreement; and McNeil has not obtained the rights to all embodiments of the patented invention because McNeil is explicitly prohibited from selling a Combination Product without the prior written consent of KAG. These arguments are noted but were not relied upon in determining that McNeil lacks standing to maintain this action.