**PENRIL DATACOMM NETWORKS, INC.**

v.

**ROCKWELL INTERNATIONAL CORP., et al.**

No. JFM–95–3750.

United States District Court, D. Maryland.

Aug. 14, 1996.

William R. Ryan, Jr., Whiteford, Taylor & Preston, Baltimore, MD, for plaintiff.

Gerard P. Martin, Martin, Junghans, Snyder & Bernstein, Baltimore, MD, Jody Maier, Weinberg & Green, Baltimore, MD, for defendants.

MEMORANDUM

MOTZ, Chief Judge.

Plaintiff is Penril Datacomm Networks, Inc. ("Penril"). Defendants are Rockwell International Corporation ("Rockwell") and U.S. Robotics Access Corporation ("Robotics"). Penril has brought this action alleging infringement of U.S. Patent 5,388,124 enti-

tled "Precoding Scheme for Transmitting Data Optimally–Shaped Constellations Over Intersymbol–Interference Channels." This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

## I.

Both Robotics and Rockwell initially moved to dismiss the original Complaint, or in the alternative, to join the University of Maryland at College Park ("UMCP") as co-plaintiff and sole owner of the patent on the ground that Penril, as a mere "licensee" of the patent, lacked standing to sue for infringement. Penril opposed by filing an Amended Complaint asserting facts of "co-ownership." The filing of this Amended Complaint rendered the initial motions filed by the Defendants. moot. Nevertheless, Rockwell subsequently filed what it called its "Reply" to Penril's opposition. Penril moved to strike this reply, or in the alternative, to file an opposition. Treating Rockwell's "Reply" as a renewed motion to dismiss, I granted Penril's request to file an opposition. Robotics, on the other hand, formally filed a second motion to dismiss the Amended Complaint, or in the alternative, to join UMCP. Pending before me, therefore, are essentially two motions to dismiss the Amended Complaint, or in the alternative, to join UMCP.

Robotics and Rockwell contend that Penril lacks standing to sue for the infringement of U.S. Patent 5,388,124. At issue is the legal effect of two documents executed after the filing of the initial Complaint and submitted by Penril with its opposition: (1) "Penril and University of Maryland at College Park Patent Ownership Agreement," ("Agreement") and (2) "Assignment of Undivided Joint Interest in U.S. Patent 5,388,124" ("Assignment"). Penril Opp'n Ex. A. The Agreement and the Assignment purport to transfer title and an ownership interest in the patent from UMCP to Penril. Penril concedes that it lacked an ownership interest in the patent before the Agreement and Assignment were executed but contends that it now is part owner of the patent, and therefore has standing to sue for its infringement.

## II.

Under the patent laws, only "[a] *patentee* shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281 (emphasis added). The term "patentee" includes not only the person to whom the patent was initially granted, but also includes any "successor in title" to the patentee. *See* 35 U.S.C. § 100(d). Thus, when rights to a patent, in whole or in part, are transferred by agreement from one person to another, courts must determine whether the agreement amounts to an "assignment" of title and ownership, or merely a "license" to make, use or sell the patent. *See, e.g., Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1131–33 (Fed. Cir.1995). In the landmark case of *Waterman v. Mackenzie*, the Supreme Court explained the essence of the assignment/license distinction:

> The patentee or his assigns may, by instrument in writing, assign, grant and convey, either, 1st, the whole patent comprising the *exclusive* right to make, use, and vend the invention throughout the United States; or, 2d, an undivided part or share of that *exclusive* right; or, 3d, the *exclusive* right under the patent within and throughout a specified part of the United States. (citation omitted). A transfer of either of these three kinds of interests is an assignment, properly speaking, and vests in the assignee a title in so much of the patent itself, with a right to sue infringers .... Any assignment or transfer, short of one of these, is a mere license, giving the licensee no title in the patent, and no right to sue at law in his own name for an infringement.

138 U.S. 252, 255, 11 S.Ct. 334, 335, 34 L.Ed. 923 (1891) (emphasis added). Courts have consistently cautioned that in determining whether an instrument transferring rights amounts to an assignment of title or merely a license, one must look to the substance and legal effect of the agreement, not what the agreement calls itself. *Id.* at 256, 11 S.Ct. at 335–36; *Vaupel Textilmaschinen v. Meccanica Euro Italia*, 944 F.2d 870, 875 (Fed.Cir. 1991) (same).

Some agreements, while not transferring title, ownership, or otherwise undivided in-

terests in the patent, nonetheless confer "exclusive" rights in the United States or a specific location therein. It is now widely held that such "exclusive licensees," while not patentees or assignees in the title holding and ownership sense, have such substantial "proprietary" rights in the patent as to have standing to pursue infringement claims. *See Abbott Labs.*, 47 F.3d at 1131 (citing *Independent Wireless Telegraph Co. v. Radio Corp. of America*, 269 U.S. 459, 46 S.Ct. 166, 70 L.Ed. 357 (1926)); *Ortho Pharmaceutical Corp. v. Genetics Institute, Inc.*, 52 F.3d 1026, 1031 (Fed.Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995). These proprietary rights, granted by the patent laws, are the rights to *exclusively* make, use, or sell the patent.[1] *Ortho*, 52 F.3d at 1031–32. The right of exclusivity thus gives licensees an equitable basis to challenge infringers, or an owner who acquiesces in the infringement by third parties. *See Philadelphia Brief Case Co. v. Specialty Leather Prod. Co.*, 145 F.Supp. 425, 428 (D.N.J.1956), *aff'd*, 242 F.2d 511 (3rd Cir.1957) (Since grant of exclusive license prevents licensor from granting further rights in patent to others, exclusive licensee has partial proprietary interest in patent entitling it to sue on equitable grounds).

■■■ However, exclusive licensees do not have standing to sue alone. Rather, they only have standing to sue as co-plaintiffs. *See Ortho*, 52 F.3d at 1030 (" 'Any rights of the licensee must be enforced through or in the name of the owner of the patent,' and 'never in the name of the licensee alone, unless that is necessary to prevent an absolute failure of justice.' ") (quoting *Waterman*, 138 U.S. at 255, 11 S.Ct. at 335). Thus, an exclusive licensee must join as plaintiff, either voluntarily or involuntarily, the true owner of the patent. *See Independent Wireless Telegraph*, 269 U.S. at 468, 46 S.Ct. at 169 (patentee is necessary party to give jurisdiction in law or equity).

■■■ "Bare" licensees, on the other hand, have no standing to bring suit, even if they attempt to join the licensor. *See Ortho*, 52 F.3d at 1031–32; *Abbott*, 47 F.3d at 1131.

"A holder of a *nonexclusive* license suffers no legal injury from infringement and, thus, has no standing to bring suit *or even join in a suit* with the patentee." *Ortho*, 52 F.3d at 1031 (emphasis added). As the Second Circuit has explained:

> In its simplest form, a license means only leave to do a thing which the licensor would otherwise have a right to prevent. Such a license grants to the licensee merely a privilege that protects him from a claim of infringement by the owner of the patent monopoly. . . . He has no property interest in the monopoly of the patent, nor any contract with the patent owner that others shall not practice the invention. Hence the patent owner may freely license others, or may tolerate infringers, and in either case no right of the patent licensee is violated. Practice of the invention by others may indeed cause him pecuniary loss, but it does him no legal injury.

*Western Elec. Co. v. Pacent Reproducer Corp.*, 42 F.2d 116, 118 (2nd Cir.), *cert. denied*, 282 U.S. 873, 51 S.Ct. 78, 75 L.Ed. 771 (1930).

Thus, to resolve the issue of Penril's standing in this case, I must examine the "Agreement" between Penril and UMCP, and the "Assignment" attached thereto, to determine whether the parties effectuated a transfer of substantial proprietary rights in U.S. Patent 5,388,124 to Penril. *See Ortho*, 52 F.3d at 1032. In undertaking this task, I initially note that the Agreement explicitly incorporates the attached Assignment, both of which represent "the entire understanding between the parties." *See* Penril/UMCP Agreement § 9–01. Thus, while the "Assignment" purports to transfer an undivided ownership interest in the patent to Penril, the Agreement also defines the interest actually granted.

Indeed, the Agreement imposes such terms and conditions on Penril that UMCP has effectively taken away what the Assignment has purportedly given. In the event Penril breaches any of these terms and conditions, or if the agreement is otherwise terminated, Penril must transfer back to UMCP

---

**1.** "Every patent shall contain . . . a grant to the patentee . . . of the right to exclude others from

making, using, or selling the invention throughout the United States." 35 U.S.C. § 154.

any ownership interest it may have obtained under the Assignment. *See* Agreement §§ 7.01–7.05. Moreover, several of these terms are clearly inconsistent with the transfer of a so called "undivided interest." For instance, Penril cannot sell to any third party its interest in the patent without UMCP's consent. *Id.* § 8.04. This restraint on alienation is clearly at odds with true ownership. *See Calgon Corp. v. Nalco Chemical Co.,* 726 F.Supp. 983, 986 (D.Del.1989) (right to alienate patent rights is an essential incident of ownership); *McNeilab, Inc. v. Scandipharm, Inc.,* 862 F.Supp. 1351, 1357 (E.D.Pa.1994) (same).

■ However, the critical flaw in the Penril/UMCP arrangement as it bears on Penril's standing is the nonexclusivity of Penril's right to make, use and sell Patent 5,388,124. Not only does the agreement allow UMCP to grant other persons these rights under the patent, it actually compels Penril, as UMCP's marketing agent, to offer nonexclusive licenses to potentially interested third parties. Section 2.01 of the Agreement provides:

> PENRIL shall be the parties' exclusive marketing and licensing agent for the LTF Patent to third parties. PENRIL shall (1) negotiate non-exclusive licenses and/or cross licenses with third parties, (2) collect income from third-party licensees, and (3) distribute income to all potentially interested third parties and use its best efforts to license said third parties. The parties agree that all licenses and cross licenses offered or entered into by Penril shall be on behalf of the parties, and subject to this Agreement.

Agreement § 2.01. In the event Penril does not fulfill its obligation in this respect, UMCP has the power to terminate the agreement, reverting any interest Penril may have had in the patent back to UMCP. *Id.* §§ 7.01, 7.02. The bottom line is that Penril has no proprietary interest or right to exclude others from making, using or selling

the patent. Under *Ortho,* Penril is thus a "bare" licensee, regardless of what the parties call their arrangement. As such, Penril has no standing.[2]

Penril does not dispute that it has nonexclusive rights to the patent. Rather, following the reasoning in a line of cases that seem to support the proposition, it contends that the Agreement otherwise grants the "most important" right under any patent; the right to sue third-party infringers. *See Ciba–Geigy Corp. v. Alza Corp.,* 804 F.Supp. 614, 630 (D.N.J.1992) (considering the transfer of the right to sue for infringement as a factor in favor of "assignment"); *see also Vaupel,* 944 F.2d at 875 (same); *Calgon,* 726 F.Supp. at 986 (citing *Crown Die & Tool Co. v. Nye Tool & Machine Works,* 261 U.S. 24, 35–39, 43 S.Ct. 254, 256–58, 67 L.Ed. 516 (1923)) (same); *McNeilab,* 862 F.Supp. at 1357 (same); *Pfizer Inc. v. Elan Pharmaceutical Research Corp.,* 812 F.Supp. 1352, 1372–73 (D.Del.1993) (same); *REFAC International, Ltd. v. VISA USA, Inc.,* 1990 WL 130032, at *4 (N.D.Cal.1990) (same). Such a grant, it contends, evidences UMCP's intent to "assign" its rights under the patent.

In *Ciba–Geigy,* for example, a transferee of certain patent rights brought suit for infringement. 804 F.Supp. 614. The court evaluated the agreement between the patent owner and the transferee to determine whether the rights granted were significant enough to be an "assignment" rather than merely a "license" for standing purposes. *Id.* at 630–35. It recognized that courts construing such contracts, in determining standing, consider whether the transferor granted the transferee "essential rights to the patent." *Id.* at 630. These essential rights, in addition to exclusivity, include the right to transfer, and "*most importantly* the right to sue infringers." *Id.* The court held, in part, that since the agreement granted this right to sue third-party infringers, the transferee

**2.** I briefly note that although the Penril/UMCP Agreement was signed after the filing of this suit, most courts would find that Penril, if properly granted leave to amend its Complaint, could assert facts, arising subsequent to filing, that support standing which relate back to the time of filing under Fed.R.Civ.P. 15(c). *See, e.g., Procter*

*& Gamble Co. v. Paragon Trade Brands, Inc.,* 917 F.Supp. 305, 309–11 (D.Del.1995) (citations omitted); *but see Afros S.p.A. v. Krauss–Maffei Corp.,* 671 F.Supp. 1402, 1445–46 (D.Del.1987), *aff'd,* 848 F.2d 1244 (Fed.Cir.1988). I need not decide this issue, however, since I find that Penril has no standing in any event.

had standing to sue. *See Ciba–Geigy,* 804 F.Supp. at 634–35.

The Penril/UMCP Agreement does indeed give Penril the right to bring suit against third-party infringers without UMCP's consent. *See* Agreement § 6.01. However, this contractual grant cannot alone confer statutory standing on Penril to bring this suit, and to the extent *Ciba–Geigy* and other cases suggest otherwise, I disagree with their reasoning. I initially note that *Calgon,* the case that seems to have first suggested that the right to sue is an essential incident to ownership, cited *Crown Die & Tool,* 261 U.S. at 35–39, 43 S.Ct. at 256–58, for this proposition. While the Supreme Court may have hinted that the right to sue is an important indicia of ownership, it also made equally clear that it is one that cannot be directly given by contract alone; in the absence of any grant of ownership rights or proprietary interest in the patent (i.e., the exclusive rights to make, use, or sell), a contractual right to sue does not confer standing. *See Crown Die & Tool,* 261 U.S. at 38–39, 43 S.Ct. at 257–58 (otherwise, patent owners could stir up litigation by giving many licensees the right to sue).

The Federal Circuit's sound reasoning in *Ortho,* its most recent decision on standing, is directly on point. After finding that the licensing agreement granted the plaintiff nonexclusive rights, the court considered whether plaintiff's contractual right to sue third-party infringers gave it standing. *Ortho,* 52 F.3d at 1034. The court held that the right to sue clause had no effect in the case because plaintiff was a nonexclusive licensee having no proprietary rights in the patent:

> [A] contract cannot change the statutory requirement for suit to be brought by the "patentee." By the same token, a right to sue clause cannot negate the requirement that, for co-plaintiff standing, a licensee must have beneficial ownership of some of the patentee's proprietary rights. A patentee may not give a right to sue to a party who has no proprietary interest in the patent. *Crown Die & Tool Co. v. Nye*

*Tool & Machine Works,* 261 U.S. 24, 44, 43 S.Ct. 254, 259, 67 L.Ed. 516 (1923).... Here, being only a nonexclusive licensee, Ortho has no inherent or implied right to sue which the clause regulates as between the parties. Thus, we conclude the right to sue clause has no effect on Ortho's standing, one way or the other.

*Id.* at 1034. Standing alone, therefore, Penril's contractual right to sue does not make it an "assignee" for standing purposes.[3]

Penril reiterates throughout its papers that its case is different from those cited by Rockwell and Robotics. Here, Penril is not merely a licensee. Rather, it holds legal title to Patent 5,388,124 as evidenced by the document entitled "Assignment of Undivided Joint Interest in U.S. Patent 5,388,124." As one holding *legal* title to the patent, it clearly has standing to sue alone. Again, however, I must look to the substantive and legal effect of the so called "Assignment," not merely what the parties themselves have called the arrangement. *See, e.g., Vaupel,* 944 F.2d at 874. The Agreement attached to the Assignment clearly and substantially limits the rights Penril would have had as title holder and owner of the patent. Most importantly, Penril does not have the right to exclude others, a point which it does not dispute. This right of exclusivity is not only at the very heart of patent law, it is at the very center of property rights generally. Without it, Penril has no proprietary interest, legal or beneficial, in the patent upon which it could sue. To hold otherwise would allow other patent owners and licensees to structure similar arrangements, transferring nonexclusive rights under the guise of ownership, a result that could subject alleged infringers to many claims and potentially inconsistent obligations.

A separate order effecting the rulings made in this Memorandum is being entered herewith.

---

3. Even those courts that concluded a plaintiff had standing, after considering a contractual right to sue as bearing on the issue, also concluded that the patentee granted other substantial *proprietary* rights, i.e., exclusivity. *See, e.g.,* *Ciba–Geigy,* 804 F.Supp. at 633–35. Penril cites no case, nor have I found any, where the court found standing based solely on a contractual right to sue given by the patentee/licensor.

## ORDER

For the reasons stated in the memorandum entered herewith, it is, this 14th day of August, 1996,

ORDERED that this action be dismissed.